**Harry HOLMES, Plaintiff-Appellee,**

v.

**J. RAY McDERMOTT & COMPANY, INC., Defendant-Appellant.**

**No. 83–3356.**

United States Court of Appeals, Fifth Circuit.

June 25, 1984.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Edward J. Koehl, Jr., New Orleans, La., for defendant-appellant.

Windhorst, Heisler, De Laup & Wysocki, James A. Wysocki, Bonnie L. Zakotnik, for plaintiff-appellee.

Before GEE, RANDALL and JOHNSON, Circuit Judges.

RANDALL, Circuit Judge:

In this action brought under the Jones Act and the general maritime law, the defendant appeals the district court's judgment on numerous grounds. For the reasons set forth below, we affirm in part, reverse in part, and remand.

## I. Factual and Procedural Background.

On May 8, 1977, the plaintiff-appellee, Harry Holmes, was employed as a rigger by the defendant-appellant, J. Ray McDermott & Company. Holmes was working on McDermott's Lay Barge 23, which was situated in the Gulf of Mexico.

While working on Lay Barge 23, Holmes and several other workers were instructed by their foreman to move a length of steel cable from one part of the vessel to another. As the men carried the cable, an eye (a doubled-over loop of cable) caught on a padeye on the deck, jerking the men to a halt. The others dropped the cable; Holmes did not, and his back was injured.

McDermott paid for Holmes' medical treatment and maintenance and cure from May 9, 1977 through August 14, 1977. During that period, Holmes was examined by four doctors to whom McDermott referred him. None found any objective indication of a back injury. McDermott's termination of Holmes' maintenance and cure on August 14, 1977 was based on these findings.

On August 16, 1977, Holmes went to Dr. Kenneth Vogel, who examined him and diagnosed a herniated lumbar disc. When Holmes did not respond to conservative treatment, Dr. Vogel hospitalized him and, on September 17, 1977, Holmes underwent a lumbar laminectomy and rhisotomy.

Suit was filed on August 24, 1977. McDermott refused to reinstate Holmes' maintenance and cure or to pay his medical bills, despite being sent Dr. Vogel's report and Holmes' hospital records.

At trial, Dr. Vogel testified that Holmes reached maximum medical recovery on September 17, 1978, and that at that time, Holmes' back pain had been alleviated seventy per cent by the surgery. He also testified that another ten per cent of Holmes' pain was relieved by the subsequent use of a transcutaneous electrical nerve stimulator, or TENS unit, for a total recovery of eighty per cent.

A psychologist and a psychiatrist, both of whom had treated Holmes, testified as

expert witnesses. The psychologist testified that Holmes' injury had contributed to a depression that continued at least until 1981, and that Holmes was not prevaricating about his continued back pain. An offshore operations safety expert testified that, in his opinion, the cable that Holmes had lifted was of an excessive and unsafe weight, whether the diameter of the cable was one-and-a-half, two-and-a-half, or four inches in diameter.

Two of Holmes' co-workers also testified with regard to the events of May 8, 1977. On direct examination, both of them were shown prior statements that they had made to Holmes' attorney. Holmes also testified as to what transpired on the day he was injured. Holmes stated that the cable was four inches in diameter, and that it was forty feet long doubled-over. He testified that there were five men involved in lifting the cable: two at each end, and himself in the middle. He stated that when he first bent over to pick up the cable, he felt a "ripping loose feeling" in his back, but continued to lift. As the crew proceeded down the barge's deck, the looped end of the cable caught on a padeye on the deck, and the rest of the men dropped the cable but Holmes held on. He testified that he felt pain in his back at that point.

The jury found for Holmes, and awarded him $412,098.22 in general damages; $7,918 for maintenance and cure from the date that it was terminated by McDermott, August 14, 1977, until the date that the jury found Holmes to have reached maximum medical recovery, June 21, 1979; special damages in the amount of $11,550 for McDermott's willful and arbitrary refusal to reinstate Holmes' maintenance and cure; and attorneys' fees in an unspecified amount for services rendered with reference to McDermott's arbitrary and willful conduct.

On the first appeal of this case, we held that because the trial court had not at the time of the appeal determined the amount of the attorneys' fee award, the judgment was not final and we did not have jurisdiction to hear the appeal. *Holmes v. J. Ray McDermott & Co., Inc.*, 682 F.2d 1143 (5th Cir.1982), *cert. denied*, 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983) ("*Holmes I*"). We recognized that in certain categories of cases, an attorneys' fee award is merely collateral to the main dispute, *see, e.g., Obin v. District No. 9 of the Int'l Ass'n of Machinists & Aerospace Workers*, 651 F.2d 574 (8th Cir.1981), and may sometimes be characterized as akin to costs, *see, e.g., Knighton v. Watkins*, 616 F.2d 795 (5th Cir.1980). We held, however, that in a case involving an award of attorneys' fees as part of the plaintiff's damages for the defendant's willful and arbitrary failure to pay maintenance and cure, the fee award constituted an element of the plaintiff's damages and "was not uniquely separable from the merits but was bound hand in hand with them." 682 F.2d at 1147. Because the amount of the award had not been set by the district court, therefore, we held that the order appealed from was not final and dismissed the appeal for want of jurisdiction. *Id.* at 1148.

On remand, the trial court heard testimony with regard to the amount of attorneys' fees and fixed them in the amount of $10,-000 for services rendered with regard to the maintenance and cure issue. This appeal on the merits of the case, including the attorneys' fee award, followed.

### ISSUES ON APPEAL.

*II. Use of Prior Statements.*

At trial, two of Holmes' co-workers who were in the crew that lifted the cable, George Bass and Stanley Thibodeaux, testified with reference to Holmes' accident. During direct examination, Thibodeaux testified that he could not remember the events of May 8, 1977 because "[i]t's hard for me to remember that far back. That's over four years ago." Record Vol. IV at 165. Holmes' attorney then asked Thibodeaux if he recalled giving a statement on March 21, 1981. Thibodeaux confirmed that he gave such a statement and that, although there were certain errors in the statement, it refreshed his recollection as to what had happened on May 8, 1977.

Although the statement asserted that the cable was four inches in diameter, Thibodeaux testified that the cable was actually two-and-a-half inches, and that his prior statement was mistaken on that point.

Similarly, Bass indicated that a statement that he had given to Holmes' attorney on January 7, 1980 refreshed his recollection as to the events of May 8, 1977. Like Thibodeaux, Bass recanted his prior statement to the extent that it stated the diameter of the cable to be four inches, and testified that he did not know what the diameter actually was. He also recanted his prior statement to the extent that it said that Holmes had "let out a scream of pain," testifying instead that Holmes "more or less grunted and grabbed his back." Record Vol. VII at 134. During closing argument, Holmes' attorney quoted from Bass' and Thibodeaux' statements.

On appeal, McDermott contends that the district court erred in permitting Holmes to use the prior statements. McDermott asserts that the statements were not taken when the events in question were fresh in the witnesses' minds; that there was insufficient indication that the witnesses did not independently recall the events in question; that the witnesses partially recanted the statements; and that the statements were handwritten by Holmes' attorney.

Federal Rule of Evidence 803(5) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness;

* * * * * *

(5) *Recorded recollection.* A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

McDermott contends that because Bass' statement was taken almost three years after the accident and Thibodeaux' statement was taken nearly four years after the accident, they cannot be considered "fresh" in the witnesses' memories. McDermott acknowledges that there is no clear standard by which freshness is determined, but asserts that "it is difficult to imagine when statements taken three and four years after the accident could be considered 'fresh.'" Holmes contends that the prior statements were used to impeach the witnesses pursuant to Federal Rule of Evidence 607, rather than to refresh their recollection pursuant to rule 803(5). Holmes also asserts that, in any case, the prior statements met the requirements of rule 803(5).

■ Our analysis of this issue renders it unnecessary for us to decide the propriety of the use of the prior statements under either rule. With regard to Bass, the record clearly reflects that, even if his prior statement was inadmissible under either rule 803(5) or rule 607, its admission was harmless error. *See* Federal Rule of Civil Procedure 61. Bass testified at length and in detail before his prior statement was brought in. His version of the accident substantially corroborated Holmes'. *See* Record Vol. VII at 100–18. Thus, to the extent that some other, relatively insubstantial, material was brought to the jury's attention by the use of the prior statement, we think it is clear that Bass' testimony before that point provided a sufficient basis for the jury's verdict. With regard to Thibodeaux, similarly, we consider any error that occurred in the use of his prior statement to have been harmless. As we have indicated, the jury had before it Holmes' and Bass' testimony, both of whom told essentially the same story. Even without Thibodeaux' testimony, the jury had before it an ample basis upon which to render its verdict for Holmes.

Nor do we consider the prior statements to have carried the import McDermott urges with regard to the diameter of the cable. Although Bass indicated in his testimony that the cable was two-and-a-half,

rather than four, inches in diameter, the safety expert who testified indicated that even a cable of one-and-a-half-inch diameter would have been of an excessive and unsafe weight. *See* Record Vol. III at 11–12; *see also infra* part III. Moreover, Bass' and Thibodeaux' statements were not the only source indicating that the cable may have been four inches in diameter. Holmes so testified, and the safety expert stated that his examination of a McDermott barge whose operations and equipment were similar to Lay Barge 23 indicated that four-inch cable was at one time present on board. *See* Record Vol. V at 140. In light of the totality of the evidence before the jury with regard to the circumstances of the accident, therefore, we conclude that the impact that use of the prior statements could have had would have been negligible, and their use does not, in this case, constitute reversible error.

### III. The Safety Expert's Testimony.

■ McDermott alleges that the expert witness who testified as to the relative safety of lifting the cable did so beyond the area of his expertise, and that the admission of this testimony was reversible error. We do not agree.

As an initial matter, we note that "[t]he admission or exclusion of expert testimony is a matter left to the discretion of the trial judge, and his or her decision will not be disturbed on appeal unless it is manifestly erroneous." *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir. 1979) (citing *Salem v. United States Lines Co.*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). McDermott argues that such manifest error occurred in the instant case because the safety expert testified with regard to the weight and stress placed upon an individual engaged in lifting a cable. McDermott asserts that such testimony was beyond the witness' expertise, because it called for mathematical and engineering conclusions. We are not persuaded that the trial court erred in permitting the expert to testify as he did. The witness testified as to his background and

training and was cross-examined both in these areas and on his substantive testimony. He explained the method by which he calculated the figures he used. Moreover, the court repeatedly admonished the jury with regard to the effect it was to accord the witness' testimony:

> I am going to permit him to give an opinion, but I want you to remember that this witness is not an engineer, and you give his testimony on those points whatever weight you think it deserves, and as I told you before, you can reject it entirely if you don't feel that he is qualified or that that is his expertise.

Record Vol. V at 153.

> The jury will decide [whether the expert's testimony is within his expertise]. They have heard [the expert]. They have heard the projections and the findings that he has made, and you will determine for yourselves whether you feel that [the witness] is expert enough to state, to make an accurate calculation of the distribution of that weight.

*Id.* at 161–62; *see also id.* at 131–32, 141–42. Thus, the court properly informed the jury that any lack of expertise or basis for the expert's testimony went to the weight to be accorded his testimony. *See United States v. Trice*, 476 F.2d 89, 91 (9th Cir.), *cert. denied sub nom. Clayton v. United States*, 414 U.S. 843, 94 S.Ct. 103, 38 L.Ed.2d 81 (1973); *Eastern Airlines, Inc. v. American Cyanamid Co.*, 321 F.2d 683, 691–92 (5th Cir.1963); *see also Nanda v. Ford Motor Co.*, 509 F.2d 213, 221 (7th Cir.1974).

### IV. Time of Maximum Medical Recovery.

■ McDermott asserts that the jury's award of maintenance and cure beyond mid-September, 1978, the point at which Dr. Vogel testified that Holmes reached maximum medical recovery, was clearly in error. McDermott maintains that the trial court should have directed a verdict or granted judgment n.o.v. on this issue. We agree.

The jury's determination of the termination date was apparently based on a letter, which was an exhibit at trial, that Dr. Vogel wrote to a prospective employer of Holmes. In this letter, dated August 27, 1979, Dr. Vogel stated that he had last seen Holmes on June 21, 1979, and that Holmes was ten to fifteen percent permanently disabled. *See* Plaintiff's Exh. 15. Holmes argues that this letter constitutes probative evidence that the date of his maximum medical recovery was properly determined by the jury to be June 21, 1979.

The standard for determining when maximum cure has been achieved, which demarcates the point at which an employer properly may terminate a seaman's maintenance and cure, has been stated by this court as follows:

> The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no *betterment* of the seaman's condition.... Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved.

*Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir.1979) (emphasis in original) (citations omitted). Under this standard, it is clear that the operative date should have been determined to be September 17, 1978.[1] At trial, Dr. Vogel's was the only testimony that addressed the date of maximum cure, and he stated:

> Q: (By McDermott's attorney): Now, let's talk in terms of when Mr. Holmes reached maximum medical recovery. What point was it in his treatment, in your treatment of him where he was not going to improve? Wasn't that back about a year from surgery?

A: Yes, about September, '78.

Q: So on September of 1978, he reached what you would consider maximum medical recovery?

A: Yes.

Q: That means as a result of surgery and the correction of the bulging disc, he is not going to improve medically beyond that point?

A: Correct.

Q: Now, he may have, after that, some spasm or some pain?

A: He may.

Q: And any treatment that you would give him would be just for the relief of that pain? It's not really to make him any better?

A: Correct.

Q: When was it that you felt that you could let him, that he could return to gainful employment where he did not have to repetitively stoop or lift greater than, or push or pull greater than 50 pounds?

A: Probably that year, a year after surgery.

Record Vol. IV at 141–42. There was no evidence or testimony that contradicted Dr. Vogel on this point. Under the standard by which we review motions for directed verdict or judgment n.o.v., therefore, *see Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc), it is clear that on this issue, the facts and evidence "point[ed] so strongly and overwhelmingly in favor" of the date of maximum cure having been reached in September, 1978, that the district court erred in concluding that the issue should have gone to the jury or, in the alternative, in failing to enter judgment n.o.v. on this issue.

█ Holmes, however, contends that the Supreme Court's decision in *Vella v. Ford Motor Co.*, 421 U.S. 1, 95 S.Ct. 1381, 43

---

**1.** Although Dr. Vogel's testimony did not include a precise date of maximum cure, he stated that he considered the point to have occurred approximately a year after Holmes' surgery, which took place on September 17, 1977. In light of this testimony, and of our overall disposition of this appeal, we do not consider it unreasonable to assume that the operative date should be September 17, 1978.

L.Ed.2d 682 (1975), supports his position and that the trial court's action was proper. In *Vella*, the plaintiff was permanently disabled from a blow to the head in 1968. At the trial of the case in 1972, his doctor testified that he had recently examined the plaintiff and had at that time determined his disability to be noncurable. He also indicated that the plaintiff's disorder was noncurable from the instant of its occurrence. The Sixth Circuit held that because the plaintiff's injury was permanent immediately after the accident, he had reached maximum medical recovery at that point and was not entitled to maintenance and cure. The Supreme Court reversed, holding:

> Denial of maintenance and cure when the seaman's injury, though in fact permanent immediately after the accident, is not medically diagnosed as permanent until long after its occurrence would obviously disserve and frustrate the "combined object of encouraging marine commerce and assuring the well-being of seamen."

421 U.S. at 4, 95 S.Ct. at 1383 (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943)). Thus, the Court held that maintenance and cure continues until the seaman's incapacity is diagnosed as being permanent. *Id.* 421 U.S. at 5, 95 S.Ct. at 1383. Holmes, however, characterizes *Vella* as standing for the proposition that the operative date is not necessarily the date that actual maximum medical recovery was diagnosed, but rather contends that maintenance and cure must continue until the date that the diagnosis has been memorialized in the form of "a medical report, medical trial testimony, [or] a medical opinion letter." Brief for Appellee at 21–22. We do not accept Holmes' assertion. While in some cases these dates may coincide, *see, e.g., Vella*, in a case such as the instant one where the two do not, the date of diagnosis must control. This conclusion is mandated by the policy underlying *Vella*: that the employer bears the burden of paying maintenance and cure until medical diagnosis confirms that maximum cure has been effected. *See, e.g., Hubbard v. Faros Fisheries,*

*Inc.*, 626 F.2d 196 (1st Cir.1980); *see generally* J. Shields, *Seamen's Rights to Recover Maintenance and Cure Benefits*, 55 Tul.L.Rev. 1046, 1047–48 (1981). We are not persuaded that continuing maintenance and cure until the date of memorialization of this diagnosis would further this policy. Here, Dr. Vogel's testimony definitively established that he diagnosed Holmes as having reached maximum cure in September, 1978. Thus, it is clear that McDermott's duty to provide maintenance and cure extended to that point, but no further.

Moreover, the Court in *Vella* quoted with approval the holding of the Second Circuit in *Desmond v. United States*, 217 F.2d 948, 950 (2d Cir.1954): "The shipowner is liable for maintenance and cure only until the disease is cured *or recognized as incurable*" (emphasis added by Supreme Court), and that of the Ninth Circuit in *Vitco v. Joncich*, 130 F.Supp. 945, 949 (S.D. Cal.1955), *aff'd*, 234 F.2d 161 (9th Cir.1956): "The shipowner's obligation to furnish maintenance is coextensive in time with his duty to furnish cure ... *and neither obligation is discharged until the earliest time when it is reasonably and in good faith determined by those charged with the seaman's care and treatment that the maximum cure reasonably possible has been effected*" (emphasis added by Supreme Court). 421 U.S. at 6 n. 5, 95 S.Ct. at 1384 n. 5. We reiterate that in the case before us, Dr. Vogel's uncontradicted testimony established that as of September 17, 1978, he diagnosed Holmes as having reached maximum medical recovery. Thus, an award of maintenance and cure beyond that date was clearly in error. Therefore, we reverse the district court's judgment to the extent that it awarded Holmes maintenance and cure after that date, and remand this aspect of the case with instructions to enter judgment awarding maintenance and cure from August 14, 1977 to September 17, 1978.

## V. Damages for Willful and Arbitrary Refusal to Continue Maintenance and Cure.

McDermott also challenges the court's award of $11,550 in special damages based

on the jury's finding that McDermott's denial of maintenance and cure was willful and arbitrary. McDermott asserts that its conduct was neither willful nor arbitrary, and that even if it was, the amount of damages was excessive because Holmes failed to show that the conduct aggravated his injury.

In *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Supreme Court held that an employer's willful and arbitrary refusal to pay maintenance and cure gives rise to a claim for damages in the form of attorneys' fees in addition to the claim for general damages. Subsequent decisions have established that, in addition to such attorneys' fees, punitive damages for such refusal are available under the general maritime law. *See Complaint of Merry Shipping, Inc.*, 650 F.2d 622, 625 (5th Cir.1981) (collecting cases); *see also Robinson v. Pocahontas, Inc.*, 477 F.2d 1048 (1st Cir.1973). In the case before us, the court made a separate award of attorneys' fees; thus, it is clear that the $11,550 award was purely punitive in nature, serving both as a deterrent and as a punishment, and did not include any such fees. *See Merry Shipping, supra.* In *Vaughan v. Atkinson*, moreover, the Court rejected the notion that the employer's conduct must be shown to have "caused" or "aggravated" the plaintiff's injury. 369 U.S. at 530, 82 S.Ct. at 999. *See also Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 375 (5th Cir.1981) ("If the shipowner, in failing to provide maintenance and cure, has been callous and recalcitrant ... or arbitrary and capricious ... reasonable attorneys' fees may also be recovered." (citations omitted)), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). Thus, we do not accept McDermott's argument that the amount of the award was excessive because of Holmes' asserted failure to show that McDermott's conduct aggravated his injuries.

We also do not accept the contention that there was insufficient evidence for the jury to have concluded that McDermott's conduct was willful and arbitrary. Conduct that gives rise to damages for the termination of maintenance and cure has been characterized as "callous and recalcitrant," *see Vaughan v. Atkinson*, 369 U.S. at 530–31, 82 S.Ct. at 999–1000; "arbitrary and capricious," *see Richard v. Bauer Dredging Co.*, 433 F.2d 954 (5th Cir.1970); and "willful, callous, and persistent," *see Solet v. M/V CAPT. H.V. DUFRENE*, 303 F.Supp. 980, 989 (E.D.La.1969). Laxness in investigating a claim that would have been found to have merit has been found to meet the standard, *see Stewart v. S.S. RICHMOND*, 214 F.Supp. 135 (E.D.La. 1963); as has a finding that the employer had "no reasonable excuse" for its refusal, *see Sims v. Marine Catering Svce*, 217 F.Supp. 511 (E.D.La.1963). In *Solet, supra*, the court found that the employer's termination of benefits in response to the seaman's retention of counsel was willful. 303 F.Supp. at 989.

McDermott bases its argument, however, on the fact that it had four doctors examine Holmes and only when they could find nothing wrong with him did McDermott terminate Holmes' maintenance and cure. However, this does not address Holmes' point, which is McDermott's failure to *reinstate* Holmes' maintenance and cure when it learned that Dr. Vogel had diagnosed his ailment. With regard to that issue, there was ample evidence from which the jury could have concluded that McDermott's conduct was arbitrary and willful.

Edward Feehan, who at the time of Holmes' injury was McDermott's workmen's compensation supervisor, testified that although he was notified of Dr. Vogel's diagnosis and Holmes' surgery, and was furnished copies of the medical and hospital reports, he decided not to reinstate Holmes' maintenance and cure payments because Dr. Vogel never consulted with, or had his diagnosis confirmed by, any of the doctors that McDermott had Holmes examined by. Feehan stated that he "was kind of upset because Dr. Vogel didn't have the courtesy to call my office and let me know who was treating the man." Record Vol.

III at 121. Feehan's testimony, essentially, established that his decision not to reinstate Holmes' benefits resulted from his disgruntlement at not being consulted beforehand, and at the fact that Holmes had filed this lawsuit against McDermott. He testified that he did not consult any other doctors about Dr. Vogel's report, and that he did not ever consider it in deciding whether to reinstate Holmes' maintenance and cure. *See* Record Vol. III at 121–24.

In light of the foregoing, we think that the jury could properly have concluded that McDermott acted willfully and arbitrarily. This case is clearly distinguishable from *Harrell v. Dixon Bay Transp. Co.*, 718 F.2d 123 (5th Cir.1983). In *Harrell*, we held there to be insufficient evidence of arbitrary and capricious refusal to reinstate maintenance and cure where the plaintiff did not inform his employer of his continuing problem or the medical treatment therefor until several years had elapsed and suit was brought. In the instant case, by contrast, Holmes notified McDermott of his claim for reinstated benefits, and the basis therefor, a mere ten days after his maintenance and cure was terminated. Holmes' complaint, which was filed August 24, 1977, specifically stated that he had sustained a possible ruptured disc. McDermott's failure to investigate or verify Holmes' claim at that point, in light of Feehan's testimony as to its reasons for not doing so, provided an ample basis for a finding of arbitrary and willful conduct.

## VI. The Amount of the Award.

█ McDermott next asserts that the amount of general damages awarded to Holmes—$412,098.22—was so excessive as to be unconscionable, as well as being against the weight of the evidence. We find no abuse of the trial court's discretion in entering judgment for this amount, *see Gantt v. Mobil Chemical Co.*, 463 F.2d 691, 701–02 & n. 5 (5th Cir.1972); *Whiteman v. Pitrie*, 220 F.2d 914 (5th Cir.1955), nor do we consider the award so large as to "shock the judicial conscience" or indicate "bias, passion, prejudice, corruption, or oth-

er improper motive" on the part of the jury. *See Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 564 (5th Cir.1979); *see also Wood v. Diamond M Drilling Co.*, 691 F.2d 1165 (5th Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983); *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364 (5th Cir. 1980).

An actuarial expert testified at trial that Holmes' lost wages between the date he was injured and the date of trial amounted to $58,231, exclusive of fringe benefits. Record Vol. VII at 205. He also testified that Holmes' future wage loss, calculated over a 34.4 year period and discounted at six percent, amounted to $174,904. *Id.* at 213. There was also testimony from Holmes' psychologist that indicated that the emotional repercussions of the accident were ongoing and resulted in a continuing depression. Record Vol. VII at 26–29. There was testimony by Dr. Vogel and by Holmes regarding the chronic pain that ensued from the injury, and will continue. *E.g.*, Record Vol. IV at 132, 141, 147 (testimony of Dr. Vogel); Vol. V at 55, 57, 58, 63, 65–67 (testimony of Holmes). There was also evidence regarding Holmes' unpaid medical bills, amounting to some $5,000, as well as evidence of the necessity for Holmes to undergo future treatment for chronic pain. Record Vol. VII at 61. Dr. Vogel also testified that Holmes was at least ten to fifteen percent permanently impaired, and Holmes testified with reference to his inability to find or hold a job due to his continued pain and discomfort. In sum, considering the extent of Holmes' past and future pain and suffering, mental anguish, and his permanent disability, we conclude that the award is very generous but not shocking to our conscience. *See, e.g., Wood v. Diamond M Drilling*, *supra*, (award of $267,000); *Gaspard v. Taylor Diving & Salvage Co.*, *supra*, 649 F.2d at 376 (award of $350,000); *Allen v. Seacoast Products*, *supra*, 623 F.2d at 364–66 (award of $240,000).

## VII. The Burden of Proof.

█ McDermott also asserts that the jury's verdict was contrary to the weight of

the evidence because Holmes failed to meet his burden of proof. It argues that the evidence was insufficient to support the jury's verdict with regard to negligence, unseaworthiness, maintenance and cure, and termination of maintenance and cure.

McDermott's argument is without merit. With regard to Holmes' unseaworthiness and maintenance and cure claims under the general maritime law, the standard we set forth in *Boeing Co. v. Shipman, supra,* is applicable: the jury's verdict must remain undisturbed unless "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict...." 411 F.2d at 374–75; *see Caldwell v. Manhattan Tankers Corp.,* 618 F.2d 361, 363 (5th Cir.1980). Our review of the record convinces us that this standard was met in this case.

 With regard to Holmes' Jones Act claim, a slightly different standard is applicable; a Jones Act plaintiff's burden has been characterized as "featherweight." *See Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 331 (5th Cir.1977); *see also Caldwell v. Manhattan Tankers,* 618 F.2d at 363. Under this standard, "even marginal claims are properly left for jury determination." *Leonard v. Exxon Corp.,* 581 F.2d 522, 524 (5th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979). The jury's verdict must be allowed to stand unless there is a complete absence of probative facts to support it. Our review of the record clearly demonstrates that Holmes met his burden of proof in this case.

### VIII. Attorneys' Fees.

Finally, McDermott asserts that the district court erred in denying its motion for a directed verdict on the issue of attorneys' fees for services rendered in connection with Holmes' maintenance and cure claim. McDermott contends that according to the pre-trial order, all issues concerning liability and damages were to be litigated in one trial. *See* Record Vol. I at 134–41. Holmes offered no evidence of attorneys' fees in his case in chief, thus prompting McDermott's motion for a directed verdict. The district court denied the motion and instructed the jury that if it found that McDermott's failure to reinstate Holmes' maintenance and cure was willful and arbitrary, it should decide whether Holmes was entitled to recover damages to compensate his attorney for services furnished in obtaining maintenance and cure. The court went on: "Now, don't put any amount of money for attorney's fees if you reach that point. Just put in there yes or no, and I will figure that out later." Record Vol. III at 345. McDermott objected to this part of the jury charge on the basis that no evidence had been presented as to the amount of attorneys' fees to be awarded as damages for McDermott's failure to continue Holmes' maintenance and cure. *Id.* at 350.

At a subsequent point, the district court held a hearing to set the appropriate amount of attorneys' fees.[2] *See* Record Vol. VIII. McDermott objected to the proceeding at its outset on the ground that its motion for a directed verdict on this issue should have been granted at the close of Holmes' case. At the hearing, the sole witness was Holmes' attorney. He testified with regard to his background and experience, and estimated that he had devoted 64.75 hours, plus trial time, to the issue of maintenance and cure in Holmes' case. The court found that he had expended 66⅔ hours on the issue, and awarded a fee of $10,000 based on an hourly rate of $150. Record Vol. II at 550.

 We think it is clear that the district court erred in denying McDermott's motion for a directed verdict on this issue.

---

**2.** Presumably the court acted in light of our dismissal of the first appeal of the case in *Holmes I* on the basis that the order appealed from was not final absent a determination of the amount of the fee. *See supra* part I. However, in *Holmes I* we never reached the merits of this or any other aspect of the case, nor did we intimate that the motion for a directed verdict on this issue was correctly denied, or that a further proceeding was in order. We simply dismissed the appeal for want of jurisdiction.

While there was evidence before the jury as to McDermott's conduct on the maintenance and cure issue from which it could properly determine that McDermott acted arbitrarily and willfully, *see supra* part V, there had been absolutely no evidence presented with regard to the amount of an attorneys' fee award. In *Holmes I,* while expressly not reaching the issue presently before us, *see* 682 F.2d at 1148 n. 10, we made it quite clear that an award of damages in the form of attorneys' fees for willful and arbitrary failure to pay maintenance and cure is a non-severable part of the plaintiff's cause of action, and an integral part of the merits of the case. See *id.* at 1147–48. In the absence of a waiver by the parties of the right to have this issue decided by the jury, it was error for it to have been severed and reserved by the trial judge. We discern no such waiver here. In *Holmes I* we noted that Holmes indicated at oral argument that the parties had so agreed. *See id.* at 1148 n. 10. Our review of the record, however, reveals no indication of such an agreement. Moreover, McDermott objected to the jury charge on the basis that no evidence had been presented as to the amount of attorneys' fees, and renewed this objection at the subsequent hearing. *See* Record Vol. III at 350, Vol. VIII at 3–4. Thus, McDermott properly preserved this issue for appeal.

In light of the *Boeing v. Shipman* standard, therefore, we conclude that the district court erred in denying McDermott's motion for a directed verdict on this issue, and reversal is warranted. As we have stated, Holmes failed to adduce any evidence at all with regard to an appropriate fee award at the time that the case went to the jury. Thus, there was not even a showing of the "mere scintilla" of evidence that we held insufficient in *Boeing. See* 411 F.2d at 374–75. Nor can the plaintiff claim to be surprised by this decision. At the time the case was tried, it was clear that we had approved the determination of the amount of attorneys' fees by the jury. *See, e.g., Blanchard v. Cheramie,* 485 F.2d 328 (5th Cir.1973).[3]

## IX. Conclusion.

In summary, we hold that the district court erred in its judgment as to the date at which Holmes reached maximum medical recovery. On this issue, a directed verdict or judgment n.o.v. should have been granted determining that the appropriate date occurred no later than September 17, 1978. Thus, we reverse as to that issue and remand the case with instructions to the district court to amend its judgment in a manner consistent with this opinion. We also reverse the trial court's award of $10,000 in attorneys' fees because of the plaintiff's failure to produce any evidence with regard to the appropriate amount. As to the other issues raised on appeal, we affirm the judgment of the district court.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**3.** *Cf. Incandela v. American Dredging Co.,* 659 F.2d 11, 15 (2d Cir.1981) (because trial judge "better equipped by training and experience" to make appropriate assessment of reasonable attorneys' fees than is jury "inexperienced in such matters," amount of attorneys' fee award to be determined by judge after such hearing as may be required).