**William LEVINE**

v.

**ZAPATA PROTEIN (USA), INC.**

**Civil Action No. 95–3291.**

United States District Court,
E.D. Louisiana.

Nov. 25, 1996.

William Neville Gee, III, William N. Gee, III, Ltd., Lafayette, for Plaintiff.

Elton Ford Duncan, III, Scott B. Kiefer, Duncan & Courington, L.L.C., New Orleans, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

### I. *PROCEDURAL HISTORY*

Plaintiff, William Levine, was injured on August 16, 1995, when he fell down a flight of stairs on defendant's vessel, the F/V AT-CHAFALAYA BAY. He commenced this lawsuit asserting causes of action under the Jones Act and General Maritime Law to recover damages for personal injuries sustained in his fall. Timely responsive pleadings were thereafter filed by the defendant and this cause came on for a non-jury trial, which commenced on November 4 and concluded on November 5, 1996.

The Court having carefully considered the testimony of all witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters its findings of fact and conclusions of law:

### II. *FINDINGS OF FACT*

During the 1995 fishing season, the plaintiff, William Levine, was working for the defendant, Zapata Protein (USA), Inc. as a fisherman aboard its vessel, the F/V AT-CHAFALAYA BAY. The F/V ATCHAFA-LAYA BAY is a steel constructed vessel 163 feet in length and 11.9 feet in depth, powered by twin-screw diesel engines. This vessel was built in 1972 at Mermentau, Louisiana, and its intended service was for use as a menhaden fishing vessel.

On August 16, 1995, shortly after 2:00 p.m., the plaintiff and a co-worker, Dale Rogers, were proceeding to the sleeping/crew quarters of the F/V ATCHAFALAYA BAY by way of the stairs on the starboard side. Plaintiff went through the doorway at the top of the landing, stepped on the first step while holding onto the handrails, slipped and fell down the 10 to 12 steps on his buttocks. The plaintiff lost his grip on the handrails and as he tried to re-grip the handrails, he twisted to the right and landed on his right hip.

The steps of the starboard side stairway are only five and a half inches rather than seven and a half to nine inches as recommended by applicable stair standards. This means that for most adult males there is only sufficient surface for the back heel of the shoe or boot to contact the step. Additionally, there is a lack of uniformity in the height of the stairs, and the angle of the stairs is 60.35 degrees. The surface on the stairs is badly worn and there is a lack of skid-proof surface on the steps. Finally, the handrail in several places on the stairs is too close to the wall making it difficult for an individual to hold on and if he loses his grip it is difficult to re-grasp his hold.

At the time of his fall the plaintiff had nothing in his hands and he was not hurrying down the stairs. Furthermore, there is no evidence of any horseplay and the plaintiff was wearing proper footwear. The condition of the stairs was the sole cause of the plaintiff's fall.

As a result of his fall, the plaintiff sustained injuries to his low back, hip and right leg. On August 17, 1995, he was brought to the Emergency Room at Abbeville General Hospital and referred to Dr. Corbert J. Le-Bouef, a general family practitioner. Dr. LeBouef first saw Mr. Levine on August 21,

1995. At that time Mr. Levine complained of pain in the low back and right hip area. Dr. LeBouef's examination revealed that Mr. Levine had a contusion of the low back and hip. Physical therapy was prescribed along with medication.

On August 25, 1995, Dr. LeBouef reexamined Mr. Levine and noted complaints of numbness in his right leg from the knee to the foot. Dr. LeBouef continued the physical therapy and medication. On September 8, 1995 Dr. LeBouef reexamined Mr. Levine for complaints of weakness in the legs and pain in the lower back. On September 8th Mr. Levine had tenderness in the right sacroiliac joint with a spasm going down into the right buttock. On September 22, 1995 Dr. LeBouef reexamined Mr. Levine and treated him for back pain and for numbness and weakness in the right leg around the knee area.

The plaintiff then sought the services of an orthopedic surgeon, Dr. Stephen Flood. On September 25, 1995 Dr. Flood treated plaintiff for lower back pain and pain in the back of the right knee with numbness down the back of the leg to the foot. Dr. Flood performed a right S.I. joint block to relieve the back pain and obtained an MRI of the right knee. The MRI revealed a small joint effusion in the knee. Dr. Flood related these injuries to the plaintiff's fall on August 16, 1995.

Dr. Flood continued to treat the plaintiff for his back and leg pains. The plaintiff's back problems improved in time but his leg pain persisted and intensified. In February of 1996 Dr. Flood performed a diagnostic arthroscopy and concluded that Mr. Levine had injuries to the ligaments of his right knee. He subsequently performed an operative arthroscopy with a partial medial meniscectomy and meniscal ligamentous repair on the right knee. The credible evidence supports the conclusion that plaintiff's knee pathology was caused by his fall.

On March 11, 1996 a second S.I. joint block was performed. On June 24, 1996 Dr. Flood detected a deep venous thrombosis in the plaintiff's leg. Although this condition does occur following trauma, it also frequently occurs without trauma. Accordingly, the doctor was hesitant in relating it to the plaintiff's injury. In a pretrial deposition he indicated it was not related. When pushed at trial Dr. Flood said it was possible and maybe probable. However, the Court was not convinced by his testimony. Therefore, the plaintiff failed to meet his burden of proof on relating the thrombosis to his injury. The condition nevertheless required treatment and has delayed the plaintiff's return to work. According to Dr. Flood, had Mr. Levine not developed venous thrombosis, he would have reached maximum medical improvement by the end of June 1996 and could have started physical therapy to prepare him for returning to some type of work. Mr. Levine is scheduled to undergo a work progressive exercise or work-hardening program in the near future in anticipation of returning to some gainful activity.

The evidence at trial showed that the plaintiff presently has the following physical restrictions: (1) limitation in lifting 25 to 30 pounds infrequently and 15 pounds frequently; (2) limitation in standing and sitting for extended periods of time, (he needs a freedom of motion environment); (3) limitation in walking on wet or uneven surfaces; (4) limitation in stooping and bending; (5) limitation in running and jumping. Furthermore, the plaintiff walks with a limp and utilizes a cane.

Mr. Levine's prognosis is guarded. With the exception of increasing his lifting capacity to about 40 pounds on a reasonably consistent basis his present limitations are expected to persist for an indefinite period.

## III. CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 46 U.S.C.App. § 688, commonly referred to as the Jones Act, and 28 U.S.C. § 1333 which provides original jurisdiction over any admiralty and maritime claims.

## A. LIABILITY

■ On and prior to August 16, 1995, the plaintiff, William Levine was employed by defendant, Zapata Protein USA, Inc., as a seaman and/or member of the crew of its vessel, the F/A ATCHAFALAYA BAY. *See*

*McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *Chandris, Inc. v. Latsis,* 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). On August 16, 1995, Mr. Levine was injured in the course and scope of his employment. A seaman such as the plaintiff who is injured in the course and scope of his employment may assert three causes of action against his employer-vessel owner: A cause of action to recover damages for negligence under the Jones Act, a cause of action to recover damages for injuries caused by the unseaworthiness of the vessel, and a claim to recover maintenance and cure. *See Schoenbaum, Admiralty and Maritime Law,* 307 (2d 1994).

■ An employer of a seaman has a duty to provide the employee-seaman with a safe place to work. *Vickers v. Tumey,* 290 F.2d 426, 430 (5th Cir.1961). In the present case the stairs were too steep and the threads of the steps were slippery due to their worn condition and lack of a skid-proof surface. Moreover, the steps of the stairs were too narrow. This condition persisted for a long period of time. There was testimony that several other crew members had slipped on these stairs. The stairs were not safe. The captain made periodic inspections of the vessel, including the stairs in question. Thus, the employer knew or should have known of these conditions. The employer breached its duty to supply a safe place to work and was negligent. Furthermore, the stairs were not fit for the purpose for which they were intended, namely to permit safe ingress and egress. *Law v. Sea Drilling Corporation,* 510 F.2d 242, 248 (5th Cir. 1975). Consequently, the vessel was unseaworthy.

The defendant's negligence and the vessel's unseaworthiness proximately caused the plaintiff's injuries and resulting damages. The plaintiff was not contributorily negligent and no act or omission on his part caused or contributed to any of his damages. Furthermore, plaintiff has adequately mitigated all of his damages.

**B. DAMAGES**

**1. INTRODUCTION**

Plaintiff, William Levine, was born on May 5, 1963. He was 32 years old on August 16, 1995, the date of his injury. His life expectancy is 36 years and his work-life expectancy is 26 years. He has lived all of his life in Abbeville, Louisiana where he completed an eighth grade education and eventually earned a G.E.D. Certificate in night school. He also attended a vocational school but did not complete the curriculum. He has eighth grade reading skills and third grade spelling and math skills along with an I.Q. of 76.

Before being employed as a fisherman by the defendant, plaintiff worked as a garbage collector for the City of Abbeville and as a laborer at a construction company. In these jobs he earned minimum wage.

In 1989, plaintiff began working for the defendant. He was a trainee until 1991 when he became a regular employee. His income tax returns from 1991 until the date of his injury reflect the following earnings: 1991—$15,658.00; 1992—$10,545.00; 1993—$12,-570.00; and 1994—$23,326.00. These figures represent the amounts earned by the plaintiff during the fishing season. This season begins in May and ends around November 1st of each year.

■ Both under the Jones Act and General Maritime Law, monetary recovery is allowed for loss of earning capacity, medical expenses and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.[1] *See Schoenbaum, Admiralty and Maritime Law,* § 6–18 (2d 1994).

**2. LOSS OF EARNING CAPACITY**

Before computing loss of earning capacity, it is necessary to determine the injured person's pre-injury wage-earning capacity. Because of the uncertainty and unpredictability of the plaintiff's employment, it is fair and reasonable to utilize the average of these years in order to determine the appropriate

---

1. In the present case the plaintiff has received maintenance through the time at which he reached maximum medical improvement so there is no outstanding maintenance currently due. *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110, 1115–6 (5th Cir.1984).

annual wage at the time of the plaintiff's injury. This figure is $15,525.00 pre tax and $13,196.00 after tax. In addition to wages, the plaintiff received fringe benefits. The defendant paid 4% of the plaintiff's wage, or $621.00, per annum toward his pension and 2%, or $311.00, per annum toward a profit sharing plan. These fringe benefits were vested.

### (a) Past Economic Loss

The evidence indicates that the plaintiff was receiving medical treatment and has not been able to work from the date of his injury, August 16, 1995, to the end of June, 1996, because of his back and leg injuries. Had he begun his work-hardening program as planned, he would have been able to return to some work by the time of trial or shortly thereafter. He has, therefore, lost wages for one fishing season, or an after tax loss of $13,196.00. His past loss of fringe benefits is $932.00. The total past economic loss sustained by the plaintiff is, therefore, $14,128.00. *Norfolk and Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689, *reh. denied* 445 U.S. 972, 100 S.Ct. 1667, 64 L.Ed.2d 250 (1980).

### (b) Future Economic Loss

Throughout his life the plaintiff has performed heavy laboring jobs. The job he was performing at the time of his injury required strenuous physical effort. He was required to walk on uneven surfaces, climb, bend, stoop, pull on nets, and lift heavy objects. Because of his injuries and permanent residual disability, it is reasonable to conclude that he will not be able to return to his fishing job. Indeed, neither his treating physician nor the doctor who examined him on behalf of the defendant would recommend his returning to his prior occupation. Nevertheless, both doctors agree that he can return to some type of work. An employment counsellor called by the plaintiff testified that after a work-hardening program, he expects the plaintiff to be able to perform a job earning $6.00 per hour based on a 40–hour work week. The job counsellor called by the defendant testified that the plaintiff could perform work earning $7.00 per hour. In view of the plaintiff's limited educational background, below average I.Q. and physical disabilities, it is reasonable to assume that he can resume some activity earning $6.50 per hour, or $13,000.00 per year pre-tax, and $11,050.00 post-tax per annum. It is likewise reasonable to assume that any job paying this wage would not provide any fringe benefits so the plaintiff would lose his entire fringe benefits.

It is impossible to calculate with any mathematical certainty the length of time that the discrepancy between what he was earning and what he is now able to earn will continue. The Court was impressed with the attitude of the plaintiff. He is no quitter. He will do his best to regain his economic capacity as fast as possible. Nevertheless, it will take some time. It appears fair and reasonable to assume that there will be a wage discrepancy for the next ten years.

Assuming a ten-year future wage loss of $2,000.00 per year, reduced to present value at a below market discount rate of 2%, the plaintiff would have a future wage loss of $17,965.00. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983), *cert. denied sub nom. Reederei v. Byrd*, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984). Further assuming a loss of fringe benefits for the same period of time at the same discount rate, the present value of the loss of pension contribution made by the employer would total $5,578.00. The present value of the loss of profit sharing contribution made by the employer would total $2,793.00. The total present value of the future economic losses would, therefore, be $26,336.00.

## 3. MEDICAL EXPENSES

### (a) Past medical expense

William Levine has incurred past medical expenses in the amount of $11,824.62. These medical expenses are reasonable and were made necessary as a result of the injuries he sustained in his fall.

### (b) Future Medical Expenses

Although the plaintiff has now reached maximum medical improvement, he will need a course of physical therapy to ready him for re-entering the job market. This program

will cost $3,000.00. This amount is reasonable and was made necessary as a result of his injuries.

### 4. *PAIN AND SUFFERING*

 Finally, the Court addresses the plaintiff's subjective losses. The plaintiff's fall caused him to sustain a soft tissue injury of the low back and a ligamentous injury to his right knee. His back injury, though painful initially, improved with time and now rarely gives him any difficulty. His leg injury required surgical intervention and has left him without a job and with a noticeable limp. The injury and his residual disabilities have had some effect on his quality of life in general. Prior to his injury Mr. Levine played basketball, jogged and performed other recreational activities requiring moderate to extreme physical activity. Currently, he is not able to physically do all of these activities. It is likely that this situation will persist for some period of time in the future. The Court finds that a fair and reasonable amount to compensate the plaintiff for past, present and future pain and suffering is $45,000. For the purpose of assessing pre-judgment interest the Court finds that $15,000 of the above amount represents the plaintiff's compensation for past pain and suffering.

### 5. *PRE-JUDGMENT INTEREST*

This was an admiralty case tried without a jury pursuant to the Court's admiralty jurisdiction invoked by Federal Rule of Civil Procedure 9(h). Accordingly, an award of pre-judgment interest is proper and left to the sound discretion of the Court. *See Doucet v. Wheless Drilling Co.,* 467 F.2d 336 (5th Cir.1972); *Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585 (5th Cir.1986), 811 F.2d 602 (1987). The Court finds that an award of pre-judgment interest from the date of judicial demand is proper in this case at the rate of 5.49 percent per annum on plaintiff's past damages as described above. *Martin v. Walk, Haydel & Associates, Inc.,* 794 F.2d 209, 212 (5th Cir.1986).

### IV. *SUMMARY*

On the basis of the foregoing Findings of Fact and Conclusions of Law the plaintiff has sustained damages and is entitled to recover from the defendant those damages in the amount of $100,288.62. Additionally, the plaintiff is entitled to pre-judgment interest on past losses totalling $40,952.62 at the rate of 5.49% per annum from the date of judicial demand until satisfied. Further, the plaintiff is entitled to post-judgment interest at the legal rate on future losses totalling $59,336.00 from the date of judgment until satisfied.

To the extent any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law constitutes the finding of fact, the Court hereby adopts it as such.

IT IS SO ORDERED.