696 So.2d 1189 (1997)
Laura LANGMEAD, Appellant/Cross-Appellee,
v.
ADMIRAL CRUISES, INC., Appellee/Cross-Appellant.
No. 95-970.
District Court of Appeal of Florida, Third District.
May 14, 1997.
Rehearing Denied August 6, 1997.
*1190 Charles R. Lipcon; Cooper & Wolfe, and Sharon L. Wolfe, Miami, for appellant.
Canning Murray & Peltz; Hicks, Anderson & Blum, and Mark Hicks, Miami, for appellee.
Before JORGENSON, FLETCHER and SORONDO, JJ.
SORONDO, Judge.
Laura Langmead (Langmead), appeals to this Court a lower court order granting Admiral Cruises, Inc.'s (Admiral) Motion for New Trial. Admiral cross-appeals the same order, which denies Admiral's Renewed Motion for Directed Verdict, Motion for Judgment in accordance with Motion for Directed Verdict, Motion for Mistrial, and Motion for Remittitur.
Langmead was an entertainer employed by Admiral to perform on its cruise ships. While exercising in the ship's gym, an elastic band she was using snapped and hit her in the eye. Langmead was treated by Dr. Joseph "Yossi" Sidikaro, a prominent Los Angeles ophthalmologist, from October 31, 1987 through May 19, 1989. In 1988, Langmead hired a lawyer to sue Admiral. Her lawyer referred her to ophthalmologist Dr. Harry Hamburger. Dr. Hamburger's charges of $160 and $75 for these two visits are Langmead's only unpaid medical bills.
In the first trial, Langmead sued Admiral for Jones Act negligence, unseaworthiness, maintenance and cure, and punitive damages. The court directed a verdict for Admiral on the maintenance and cure and punitive damages claims. The negligence and unseaworthiness claims went to the jury, which found against Langmead on the unseaworthiness claim, but for her on the negligence claim. The jury awarded $50,000, which was reduced to $5,000 by a 90% comparative negligence finding. The jury was instructed to award sums for Langmead's past and future medical expenses, including those for Drs. Hamburger and Sidikaro.
Langmead appealed. This Court affirmed the jury's verdict, holding the comparative negligence issue was properly submitted to the jury, but reversed and remanded the *1191 directed verdict for Admiral on the maintenance and cure claim, holding that the issue of when Langmead reached "maximum medical cure" should have been submitted to the jury. Langmead v. Admiral Cruises, Inc., 610 So.2d 565 (Fla. 3d DCA 1992).
The second trial concerned: 1) whether Langmead's two visits to Dr. Hamburger constituted "cure" that Admiral should have paid for; 2) whether Langmead was owed two weeks' lost wages due to her injury; and 3) whether Admiral's failure to pay was arbitrary and capricious, warranting punitive damages. The trial court directed a verdict against Langmead on her maintenance claim.
While Langmead claimed that she was never paid $730 in wages she lost for the two-week period she was out of work ($365 per week), Admiral claimed that she was fully paid for both weeks. The jury awarded Langmead $160 and $75 for Dr. Hamburger's bills, $730 for lost wages, and $3.5 million for punitive damages.
The trial court granted Admiral's motion for a new trial. In its order, the court determined that the jury verdict was contrary to the manifest weight of the evidence and was influenced by prejudicial matters, finding: 1) Langmead improperly presented immaterial, prejudicial and speculative evidence in questioning Dr. Hamburger about her deteriorating permanent eye condition, caused by Admiral's failure to provide treatment he recommended after seeing Langmead; 2) Langmead improperly presented prejudicial closing argument that "we are here over an important principle," sending a message and suggesting that Admiral may be abusing other people; 3) Langmead improperly presented prejudicial and inflammatory closing argument about how much money and time Admiral spent defending and litigating this case, while refusing to pay a $235 bill; and 4) the amount of punitive damages was contrary to the manifest weight of the evidence, was so grossly excessive as to shock the judicial conscience, was a product of passion and prejudice, and bore no relationship to Langmead's harm and Admiral's level of culpability.
We reverse the order under review in as much as it grants Admiral a new trial on the issue of liability and actual damages, and violates the law of the case. Langmead, 610 So.2d at 567. The record fully supports the jury's verdict, and we find that the trial court abused its discretion in granting Admiral a new trial.
The more difficult issue presented to this court is the trial court's ruling granting Admiral a new trial on the issue of punitive damages. In reviewing this part of the trial judge's order we begin with an analysis of the applicable law in the area of punitive damages.
Admiral argues that the punitive damage award in this case is so excessive that it violates Federal and Florida Constitutional notions of substantive due process.[1] It relies on the United States Supreme Court's decision in BMW of North America v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In BMW, the plaintiff purchased what he thought to be a brand new BMW automobile for $40,750.88 from an authorized dealer in Alabama. After driving the car for several months the plaintiff took the car to an independent detailer to make the car look better. The detailer advised plaintiff that the car had, in fact, been repainted. Plaintiff then sued BMW of North America alleging, inter alia, that the failure to disclose the repainting of the car constituted suppression of a material fact. He sought compensatory and punitive damages in the amount of $500,000.
At trial, BMW acknowledged that in 1983 it had adopted a policy whereby damaged cars would be sold as new if the damage did not exceed 3 percent of the suggested retail price. The damage to plaintiff's car, the cost of repainting it, was only $601.37, or 1.5 *1192 percent of its suggested retail value. BMW did not advise the dealer about the repainting done on the car.
The plaintiff called an expert witness to testify that his actual damages were $4,000, approximately 10 percent of the price he paid for the vehicle. In support of his request for punitive damages the plaintiff presented evidence that BMW had sold close to 1000 refinished cars as new, nationwide. He argued to the jury that using his $4,000 figure as the real damage number, a punitive damage award of $4 million would be appropriate.
BMW responded that the value of the plaintiff's car was not, in fact, decreased in any way and that it had no obligation to disclose repairs of minor damage to new cars. Additionally, it argued that its activities in jurisdictions other than Alabama were completely irrelevant to the litigation.
The jury returned a verdict for the plaintiff awarding him $4,000 in compensatory damages and $4 million in punitive damages. On appeal, the Alabama Supreme Court ordered a remittitur reducing the punitive damage award to $2 million. The United States Supreme court granted certiorari "because... a review of this case would help illuminate `the character of the standard that will identify constitutionally excessive awards' of punitive damages." BMW,___ U.S. at ___, 116 S.Ct. at 1595.
The Court analyzed the excessiveness of the punitive damage award by addressing three criteria: 1) the degree of reprehensibility of the defendant's conduct; 2) the ratio of the punitive damage award to the actual harm inflicted on the plaintiff; and 3) the comparison between the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct.
As concerns the first "indicium of reasonableness," the Court found that BMW's conduct "was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award." Id. at ___, 116 S.Ct. at 1601. As to the second, the Court observed that the punitive damage awarded to the plaintiff was 500 times the amount of the actual harm as determined by the jury. In this regard, the Court commented: "When the ratio is a breathtaking 500 to 1, however, the award must surely `raise a suspicious judicial eyebrow.'" Id. at ___, 116 S.Ct. at 1602. Finally, as to the third, the Court found that the award in question was "substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance." Id. at ___, 116 S.Ct. at 1603.
The Court's analysis is instructive and, in considering Admiral's due process argument, we now review the facts of the present case under the same criteria.

I. The degree of reprehensibility of the defendant's conduct.
In order to gauge the reprehensibility, if any, of the defendant's conduct we have conducted a detailed review of the treatment Admiral afforded to Langmead throughout the relevant time.
Immediately after her injury Langmead was examined by the ship's physician, Dr. Sullivan. In order to insure the best possible treatment, Dr. Sullivan called Dr. Sidikaro in Los Angeles, California for advice on how to treat Langmead's injury. Dr. Sidikaro told Dr. Sullivan to have Langmead he flat on her back with a patch on her eye. Langmead was injured at sea on a Thursday. The ship got back to Los Angeles on Saturday. Immediately upon docking in Los Angeles, Admiral transported her to see Dr. Sidikaro.
Dr. Sidikaro is a board certified ophthalmologist. He is a retina specialist and surgeon. At the time Langmead saw him, he was a full-time associate professor of ophthalmology at the University of California at Los Angeles (UCLA) at the Jules Stein Eye Institute.[2] Presently, Dr. Sidikaro remains on the faculty of UCLA and conducts a private practice from his office on Rodeo Drive in Beverly Hills, California.
For the three days following her injury, Langmead did not work but was paid by Admiral. After leaving the ship, she had to *1193 remain ashore for one week so that Dr. Sidikaro could see her and follow-up. Admiral paid for her stay at a hotel and for her food. Langmead claims she was not paid for this week off the ship. Admiral claims her band was paid but that Langmead apparently did not receive her cut of the money. The jury decided this issue against Admiral.
After she was certified fit for duty, she returned to the ship and had continuing problems with her eye. While in Puerto Vallarta, Mexico she had to return to Los Angeles to see Dr. Sidikaro. Admiral flew her to Los Angeles on a Tuesday and she remained there until the ship returned to Los Angeles on Saturday. She was paid for these 3 days. Langmead testified that she never received a bill from Dr. Sidikaro and that she was happy with his care. Dr. Sidikaro testified that he treated Langmead on October 31, November 4, November 14, November 18, and November 30, 1987. He then saw her on January 23, and May 20, 1988. He submitted all bills to Admiral, and was paid in full.
At some time during the first quarter of 1988, Langmead was transferred to the east coast. She testified that she went to see Dr. Harry Hamburger on the recommendation of her lawyer. She never asked Admiral to refer her to an eye doctor in Miami. Dr. Hamburger told her she would need eye exams every three months.
Before going to see Dr. Hamburger for a second time, Langmead consulted the doctor on the "Emerald Seas" who advised her to check with Admiral before continuing her treatment with Dr. Hamburger. She did and was told that she could not go back to see Dr. Hamburger but that they would recommend another physician. Admiral referred her to a Dr. Gilbert in Miami. She visited him once but did not return. Admiral paid for the visit.
Dr. Hamburger testified at trial that he was hired by Langmead's attorney. His first bill for her initial office visit in November of 1988 was $160. The second and last time he saw her was in June of 1990. His bill for the second visit was $75. Dr. Hamburger testified that he never billed Admiral for his services and that all bills were sent to Langmead's lawyer, who was the one who hired him. Admiral refused to pay the total bill of $235 because, in its view, Dr. Hamburger had been retained for purposes of litigation. The jury also decided this issue against Admiral.
We are hard pressed on these facts to find any reprehensible conduct on the part of Admiral. Indeed, the facts suggest exactly the opposite. Admiral referred Langmead to a highly recognized and respected ophthalmologist who teaches and practices medicine at one of the most prestigious eye institutes in the nation. Shortly after she began her treatment, she complained of discomfort and Admiral flew her from Puerto Vallarta, Mexico to Los Angeles so that she could visit with her treating physician. Upon her return to Miami, Admiral again referred her to a physician for treatment. The only bill Admiral refused to pay was Dr. Hamburger's. The refusal was based on Admiral's understandable, and we feel reasonable, conclusion that Dr. Hamburger was hired upon the advice of Langmead's lawyer, in contemplation of litigation.[3] The fact that the jury found against Admiral on this issue does not compel the conclusion that the cruise line's conduct was reprehensible for purposes of this analysis. We conclude that at all times relevant to the significant events in this case Admiral behaved in good faith.[4]

II. The ratio of the punitive damage award to the actual harm inflicted on the plaintiff.
The actual damages awarded by the jury in this case consisted of 2 doctor's bills which *1194 equal $235, and lost wages of $730, for a total of $965. The punitive damage award of $3.5 million was 3,626 times greater than the actual harm inflicted on the plaintiff. If the United States Supreme Court found a ratio of 500 to 1 to be breathtaking, we can safely presume that this case's ratio of 3,626 to 1 would send the high Court into cardiac arrhythmia. The enormous disparity between the actual damages awarded to Langmead and the punitive damage award has most certainly raised the "suspicious judicial eyebrow[s]" of this Court.

III. Comparing the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct.
Because we find that Admiral acted in good faith in its dealings with Langmead, we believe that it is not guilty of any misconduct. For purposes of this analysis, we have evaluated Admiral's conduct within the context of cases dealing with seamen's rights. The case law is clear that an employer is guilty of misconduct and will be liable for punitive damages for its refusal to pay maintenance and cure only when its conduct is "callous and recalcitrant,"[5] "arbitrary and capricious"[6] or "willful, callous and persistent."[7] Applying this standard, we conclude that Admiral's conduct towards Langmead complied with the applicable law.

CONCLUSION
As stated above, we reverse the order granting Admiral a new trial on the issue of liability and actual damages and remand with instructions to reinstate the jury verdict on those issues.
We agree with the trial judge that "the amount of the punitive damage award is contrary to the manifest weight of the evidence, is so grossly excessive as to shock the judicial conscience, is a product of passion and prejudice, and bears no relationship to the plaintiff's harm and defendant's level of culpability." We further hold that the award of punitive damages is so excessive that it "transcends the Constitutional limit," BMW, ___ U.S. at ___, 116 S.Ct. at 1604, and violates Admiral's rights to substantive due process under the Federal and Florida Constitutions. Additionally, because we find no record evidence whatsoever to justify any award of punitive damages in this case, we reverse the trial judge's order granting a new trial on this issue and remand with instructions to grant Admiral's motion for directed verdict as to punitive damages.
NOTES
[1] Admiral invites us to follow the ruling of the Fifth Circuit Court of Appeals in Guevara v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir.1995)(en banc), cert. denied, ___ U.S. ___, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996), where that court held that punitive damages are no longer available for a shipowner's willful refusal to pay maintenance and cure. For the reasons set forth in Kloster Cruise Limited v. Segui, 679 So.2d 10 (Fla. 3d DCA 1996), we decline Admiral's invitation to visit this issue at this time.
[2] Langmead's expert, Dr. Hamburger, testified that this eye institute is at the same level as the Bascom Palmer Eye Institute in Miami, Fla.
[3] Holmes v. J. Ray McDermott & Co., Inc., 734 F.2d 1110, 1118 (5th Cir.1984) (citing Sims v. Marine Catering Svce., 217 F.Supp. 511 (E.D.La.1963)) (punitive damages proper where there is no reasonable excuse for non-payment), overruled on other grounds by Guevara v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir.)(en banc), cert. denied, ___ U.S. ___, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996) (only insofar as punitive damage availability is concerned).
[4] Harper v. Zapata Off-Shore Co., 741 F.2d 87, 90 (5th Cir.1984) ("We think ... that the willful, wanton and callous conduct required to ground an award of punitive damages requires an element of bad faith"), overruled on other grounds by Guevara, supra (only insofar as punitive damages availability is concerned).
[5] Vaughan v. Atkinson, 369 U.S. 527, 530-31, 82 S.Ct. 997, 999-1000, 8 L.Ed.2d 88 (1962).
[6] Richard v. Bauer Dredging Co., 433 F.2d 954 (5th Cir.1970), overruled on other grounds by Guevara, supra (only insofar as punitive damages availability is concerned).
[7] Solet v. M/V CAPT. H.V. DUFRENE, 303 F.Supp. 980, 989 (E.D.La.1969), overruled by Guevara, supra (only insofar as punitive damages availability is concerned).