**Joseph H. BOMMARITO,**
**Plaintiff–Appellee,**

v.

**PENROD DRILLING CORP.,**
**Defendant–Appellant.**

**No. 90–3175.**

United States Court of Appeals,
Fifth Circuit.

April 22, 1991.

Andrew C. Wilson, Bernard H. Ticer, Daniel E. Knowles, III, Burke & Mayer, New Orleans, La., for defendant-appellant.

Robert T. Myers, Robert J. Young, Jr., Young, Richaud, Theard & Myers, New Orleans, La., for plaintiff-appellee.

Before BROWN, SMITH, and WIENER, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Plaintiff Joseph Bommarito brought this Jones Act/general maritime law action seeking damages for work-related back injuries against his employer, Penrod Drilling Corporation (Penrod). The trial court entered judgment on a jury verdict in Bommarito's favor and denied Penrod's motions for j.n.o.v., new trial, and remittitur. Penrod now appeals, asserting that the trial court erred in (1) denying its motion for directed verdict, (2) refusing a certain jury instruction, and (3) excluding expert testimony regarding a relevant statistical study. Unable to find any error in the district court's actions, we affirm its judgment.

*A Heavy Load*

In June 1988 Bommarito was employed as a watch-stander aboard the rig PENROD 78, a semi-submersible drilling rig moored off the Louisiana coast. As a watch-stander, Bommarito was responsible for checking the vessel for proper balance during the drilling operation as well as for adherence to safety regulations. On June 30, 1988, Bommarito came upon several empty oxygen and acetylene tanks (cylinders) that had been left in the lower hold of the rig by Penrod welders. Because these tanks posed a fire hazard, Bommarito reported the misplaced tanks to his supervisor, Cy Thompson, who instructed Bommarito to move the empty cylinders. Thompson sent Johnny Jones, a roust-about, to the lower hold to help Bommarito move the oxygen and acetylene tanks (empty weight 144 lbs. and 180 lbs., respectively) to the proper storage facility.

According to Bommarito, the two moved the first cylinder to the "drill tool room" without incident. In order to reach the room, they had to raise the tank over the "lip" of a watertight doorway. As they were moving the second tank through the doorway, Bommarito suffered an injury to his back. Bommarito alleges that Jones did not properly raise the cylinder and shifted a disproportionate share of its weight to Bommarito, injuring him. Adding to his claim that Jones himself was negligent, Bommarito also states that the employer was negligent in furnishing an unfit helper, who he says had not fully recovered from a serious ankle injury and had a heart ailment at the time of Bommarito's injuries. Jones, called as a witness for Penrod, testified that his ankle was completely healthy on June 30, 1988, that his heart problem did not affect his job performance, and that, in any event, Bommarito was lifting the cylinders by himself in a "bear hug" fashion when he allegedly suffered the injury to his back.

Immediately following this incident Bommarito reported his injury to the toolpusher who prepared an accident report. Thereafter Bommarito was transported by helicopter to a nearby hospital where emergency treatment was administered. Advised by physicians not to return to offshore employment, Bommarito obtained a lower-paying desk job at the Naval Air Station in Pensacola, Florida.

Bommarito filed suit against Penrod under the Jones Act, 46 U.S.C.App. § 688, and charged that his injuries were caused by Penrod's negligence in assigning Jones the task of aiding him in lifting the heavy cylinders, and because of the unseaworthiness of the rig PENROD 78. The jury found for Bommarito on both the negligence and unseaworthiness claims and awarded him $355,000 in damages.

At the close of the plaintiff's evidence, the trial court rejected Penrod's motion for directed verdict on the issues of Jones Act

negligence and unseaworthiness. During the defense's presentation, the trial court precluded Penrod's economist expert from mentioning the "Camus Report," a private statistical study of offshore workers. At the end of all the evidence, Penrod renewed its motion for directed verdict, which the court again denied, as it did Penrod's motions for j.n.o.v., new trial, and remittitur. Penrod brings this appeal.

### Directed Verdict Properly Denied

Penrod argues that the district court erred in denying the employer's motions for directed verdict as to both the negligence and unseaworthiness claims. The employer contends that Bommarito failed to adduce any evidence which showed Jones was negligent, or that connected his back injury to any act by Penrod or any condition on the rig and, therefore, that it was entitled to a directed verdict.

#### (i) Jones Act Negligence

■ As this Court has held in countless cases presenting the Jones Act "featherweight" burden, directed verdict is justified "[o]nly when there is a complete absence of probative facts to support the verdict." *Thornton v. Gulf Fleet Marine Corp.*, 752 F.2d 1074, 1076 (5th Cir.1985) (*quoting Lavender v. Kurn*, 327 U.S. 645, 652, 66 S.Ct. 740, 743, 90 L.Ed. 916, 922 (1946)); *see also Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir.1983), *modifying* 666 F.2d 294 (5th Cir.1982); *Alvarez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1042 (5th Cir.1982). The jury's verdict must be allowed to stand unless the plaintiff failed to put forth at least a marginal claim for relief. *See id.; Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110, 1120 (5th Cir.1984); *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979). Like the trial court, we review all evidence in the light most favorable to the party (Bommarito) opposing the motion. *Day v. South Park Independent School Dist.*, 768 F.2d 696, 699–700 (5th Cir.1985); *Brewer v. Blackwell*, 692 F.2d 387, 391 (5th Cir.1982).

■ Our review of the record leads us to conclude that Bommarito easily met his "featherweight" burden of proof. *See Holmes*, 734 F.2d at 1120. Bommarito's theory emphasizes that Jones, the helper assigned to assist Bommarito in lifting the heavy cylinders, by favoring his earlier-injured ankle, shifted a disproportionate amount of weight to Bommarito, resulting in injuries which Bommarito immediately sustained and reported. Penrod asserts that Bommarito failed to put forth any evidence which linked his injuries to Jones's physical condition.

All of this was for jury resolution. At trial, several witnesses, including Jones and Bommarito, testified that Jones suffered a severe injury to his ankle in September 1987 and reinjured it in May 1988. Medical reports corroborated this testimony and supported Bommarito's claim that Jones also had a heart condition. Bommarito also testified that he observed Jones limping and heard him complain of pain from the ankle after he returned to work, and that supervisors had decided to "take it easy on him" until he was fully recovered. Finally, Bommarito testified on direct examination that his back injury occurred as a result of Jones's shifting the weight of the tank, presumably from his favoring his ankle while the two were carrying the heavy cylinder. Bommarito summed it up: "With the condition of his ankle and then he was trying to keep the weight off of it and I ended up getting hurt."[1] Bommarito also recounted the following exchange:

Q. Did you say anything to Johnny Jones at the time that you injured your back?

1. Penrod cites *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250 (5th Cir.1980), for the proposition that this statement does not satisfy the applicable directed verdict scrutiny. *Lubbock Feed Lots*, however, set down this Circuit's test for the *admission* of lay opinion testimony under F.R.Evid. 701. A question of evidence is not even before us, as Penrod did not voice any objection to Bommarito's "conclusory" testimony and on appeal does not press the issue of the statement's admissibility.

A. Yes, sir, something to the effect, Darn it, Johnny, why didn't you pick up more on it? ...

Penrod argues that this crucial portion of Bommarito's testimony was conclusory and did not provide the probative facts necessary to survive the employer's motion for directed verdict. Although Jones countered that Bommarito lifted the cylinder without help and against company regulations, Bommarito's contrary evidence made the issue one for jury determination. *See Thornton*, 752 F.2d at 1076. Viewing the evidence in Bommarito's favor, we hold that his claim that Jones shifted too much of the cylinder's weight to him is sufficiently supported.

### (ii) Unseaworthiness

■ Because the judgment is adequately supported on the Jones Act negligence claim, consideration of the unseaworthiness aspect of the suit is unnecessary. *See* F.R. Civ.P. 61. Nevertheless, we sustain the trial court's rulings on unseaworthiness.

We evaluate the denial of Penrod's directed verdict motion as to Bommarito's unseaworthiness claim under a different, less stringent standard than that applied to Jones Act negligence. As we stated in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc), directed verdict disposal of such a claim is justified only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict...." *See also, Thornton*, 752 F.2d at 1075–76. Bommarito based the unseaworthiness claim on Jones's incapacity. He asserts that the rig PENROD 78 was unseaworthy because of the injured roust-

about's inability to perform the heavy labor assigned. *See Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955) (unfit crew may provide basis for unseaworthiness claim); *Miles v. Melrose*, 882 F.2d 976, 981 (5th Cir.1989) (same). We find that the evidence presented in support of the negligence claim also satisfies the *Boeing* standard and hold that the trial court did not err in denying Penrod's motion for directed verdict on the unseaworthiness claim.

### Instruction On Unseaworthiness

■ Penrod also contends that the trial court improperly charged the jury on the law of unseaworthiness and improperly refused Penrod's requested instruction. We afford the trial judge's choice of jury instructions great deference, employing a two-part test to evaluate objections to the court's failure to give a requested instruction. The complaining party must first "show that the proposed instruction correctly states the law. If it does, the court will determine whether the instructions actually given were accurate or misleading." *Treadaway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161, 167 (5th Cir.1990); *see also, Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 424–25 (5th Cir.1985). An inadequate instruction merits reversal only when "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Treadaway*, 894 F.2d at 167–68 (citations omitted).

Penrod asserts that the jury charge which the court gave was deficient in that it did not properly distinguish between negligence and unseaworthiness.[2] Penrod con-

2. The trial court's instruction on unseaworthiness provided:

The duty of the vessel owner to provide a seaworthy vessel requires that the vessel and its parts and equipment must be reasonably fit for their intended uses. Thus, this duty extends not only to the vessel itself, but to all of its parts and equipment, so that the vessel, its gear, appurtenances and operation must be reasonably safe. The duty to provide a seaworthy vessel also includes a duty to supply an adequate and competent crew. A vessel

may be found to be unseaworthy even though it has a numerically adequate crew, if too few persons are assigned to a given task.

The duty to provide a seaworthy vessel is absolute and the owner may not delegate the duty to anyone. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. If an owner does not provide a seaworthy vessel, then no amount of care or prudence excuses him, whether he knew or should have known of the unseaworthy condition.

tends that the instruction given permitted the jury to generalize from evidence that Jones had been injured in the past that the PENROD 78 was unseaworthy, shifting the burden of showing (the absence of) proximate cause to the defendant employer. Specifically, Penrod urges that the court's instruction failed to advise the jury that it could not find the vessel unseaworthy unless Jones's "incompetence or unfitness ... [rose] to the level of a hazard of the vessel." *See Ward v. Union Barge Line Corp.*, 443 F.2d 565, 571 (3d Cir.1971).

Initially we point out that the unseaworthiness instruction given adheres, almost verbatim, to the language of the Fifth Circuit Pattern Jury Instruction entitled "Jones Act—Unseaworthiness." *See* Pattern Jury Instructions, Civil Cases, U.S. Fifth Circuit District Judges Association (1983), at pp. 57–62. Penrod complains, however, that the pattern charge is not clear as to what is meant by the phrase "reasonably adequate for their assigned tasks" as it applies to crew members.[3] In its brief, the employer contends that, under the instruction given, the jury could have concluded that Jones was less than adequate for his assigned tasks "despite evidence that ... the crew member did not cause a particular accident."

■■■ Although Penrod's requested instruction might have been more favorable to its case, mere differences in form or emphasis in jury instructions do not constitute reversible error. *Freimanis v. Sea–Land Service, Inc.*, 654 F.2d 1155, 1164 (5th Cir.1981); *Fleming v. Michigan Mutual Liability Co.*, 363 F.2d 186, 189 n. 4 (5th Cir.1966). In fact, the trial court stated that the requested charge was "certainly implicit in the instructions that were given." We agree and therefore affirm the district court. *See Freimanis*, 654 F.2d at 1163. Penrod's claim that the court did not properly explain the proximate cause requirement as it applies to the unseaworthiness claim is belied by the language of the instruction itself.[4] Finally, although the language of the trial court's instruction is not as strong as the Third Circuit's holding in *Ward*, this Court has not applied the Third Circuit's "hazard" standard in unseaworthiness claims, and we decline to do so here.[5]

> On the other hand, the owner of a vessel is not required to furnish an accident-free ship. The duty of the owner is only to furnish a vessel and appurtenances reasonably fit for their intended use and *a crew that is reasonably adequate for their assigned tasks.*
>
> A vessel is not called upon to have the best of appliances and equipment, or the finest of crews, but only such gear as is reasonably proper and suitable for its intended use and *a crew that is reasonably adequate.*
>
> In summary, if you find that the owner of the vessel did not provide adequate crew of sufficient manpower to perform the tasks required, or *if you find that the vessel was in any manner unfit in accordance with the law as I have just explained to you, and this was a proximate cause of the injury,* which term I will hereinafter explain to you, then you may find that the vessel was unseaworthy and the shipowner liable, without any reference to the issue of negligence on the part of the defendant or any of its employees.
>
> However, should you find that the owner had a capable crew and that the appliances *and gear were safe and suitable for their* intended use, then the vessel cannot be said to have been unseaworthy and there can be no liability of the defendant owner in this regard.

> Now let us consider the matter of "causation." Not every injury that follows an accident necessarily results from it.
>
> With respect to causation, a different rule applies to proof of this matter under the Jones Act than is applicable to a claim of unseaworthiness.
>
> \* \* \* \* \* \*
>
> *However, with respect to the unseaworthiness claim, it is necessary that the plaintiff show, not merely that the unseaworthy condition was a cause of the injury, but that such condition was a proximate cause of it. In other words, the plaintiff is required to show not only that the act or omission played a substantial part in bringing about or actually causing the injury to him, but also that the injury was either a direct result or a reasonably probable consequence of the act or omission.*

(Emphasis added.)

3. *See* note 2, *supra.*

4. *See* note 2, *supra* (emphasized language).

5. *Ward* relied on the Supreme Court's decision in *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). *See Ward*, 443 F.2d at 571 (*citing Usner*). *Ward*

The jury was adequately instructed on the principles applicable to an unseaworthiness claim. Likewise, it was properly guided in its deliberations. *See Treadaway*, 894 F.2d at 167–68.

### The Camus Report: A "Stranger"

■ Lastly, Penrod complains that the trial court committed "prejudicial error" in refusing to allow the introduction of the "Camus Study" or any comment thereon by Penrod's economic expert into evidence at trial. Illustrating the wisdom of the rule requiring ample objection to and proffer of excluded evidence, *see* F.R.Evid. 103(a)(2), we know little about the Camus Report, except that it is a study of the life expectancy of offshore workers performed by Richard Camus. On this record, we are not able to ascertain what the Camus Report concludes, the indicated bases for such conclusions, or their apparent effect on this lawsuit. When Penrod's expert first mentioned this report, the trial court instantly declared that it would not allow further mention of the study.[6] Penrod, unaware or indifferent to F.R.Evid. 103(a)(2),[7] did not proffer the report.

As in cases where we refuse to reverse exclusion of expert opinions proffered by plaintiffs, *see Smogor v. Enke*, 874 F.2d 295, 297 (5th Cir.1989), we will not disturb the trial court's decision to exclude the Camus Study because Penrod simply cannot demonstrate that the court's decision was "manifestly erroneous." *See also, Boyle v. Pool Offshore Co.*, 893 F.2d 713,

718 (5th Cir.1990). Whether the trial court's instantaneous exclusion of the study was sound or unsound is a complete unknown to this Court, presented as we are with a totally negative record. *See* F.R. Evid. 103(a)(2).

### Conclusion

The trial court's rulings were correct. AFFIRMED.

---

points out that the High Court's primary emphasis in *Usner* was on the distinction between claims of negligence and unseaworthiness. As we stated in *Freimanis, Usner* held that, "[i]f the unseaworthy condition is created simultaneously with the injury, liability does not attach to the owner." *Freimanis,* 654 F.2d at 1163 n. 7. The instant case does not present a conflict with *Usner* or the thrust of *Ward.*

6. The following exchange took place between Penrod's counsel, Penrod's expert, and the court:

Q: Dr. Wood, what is the basis for your calculation of the offshore work life?

A: The offshore work life is developed by a study of offshore workers performed by Richard Camus.

The Court: I sustain the objection to that.

Mr. Wilson: Your Honor, may we approach the bench?

The Court: I never have allowed it. I know what the Camus Report is. It is restricted to certain, I do not believe it is a reliable basis for an expert to testify, and I have so ruled on many occasions.

7. F.R.Evid. 103 provides, in pertinent part:

**(a) Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

\*  \*  \*  \*  \*  \*

**(2) Offer of proof.** In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.