**David TURNAGE, Plaintiff–Appellant,**

v.

**GENERAL ELECTRIC CO., et al., Defendants–Appellees.**

No. 90–3414.

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1992.

Camilo K. Salas, III, Robert E. Winn, Sessions & Fishman, New Orleans, La., William E. Andrews, III, Purvis, Miss., for David Turnage.

Lawrence J. Ernst, Charles M. Lanier, Jr., Christovich & Kearney, New Orleans, La., for General Elec.

Arthur A. Crais, Jr., New Orleans, La., for Shell Offshore, Inc.

Michael D. Carbo, Didriksen & Carbo, New Orleans, La., for P & S Diesel.

Russell M. Cornelius, James C. Murphy, Jr., Cornelius, Sartin & Murphy, New Orleans, La., for Boyce Machinery.

Before BROWN, DAVIS and BARKSDALE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In a suit for damages brought as a result of burns he suffered while employed on an offshore rig, Plaintiff–Appellant David Turnage appeals a jury verdict in favor of Defendants–Appellees General Electric Company (GE), P & S Diesel Services, Inc. (P.& S), and Boyce Machinery Corporation (Boyce). Specifically, Turnage appeals (i) the denial of his discovery motion requesting an internal examination of a circuit breaker and (ii) the court's charge concerning the identity of a shut-off mechanism and an instruction describing the liability of the shut-off mechanism's remanufacturer. Turnage also appeals the district court's grant of summary judgment in favor of Shell Offshore, Inc. (Shell).

Because the district court did not abuse its wide discretion in denying the discovery request, we affirm the district court's discovery ruling. Because there are no genuine issues of material fact regarding Shell's liability such that a reasonable finder of fact could hold in Turnage's favor, we affirm the granting of summary judgment as to Shell. Finally, however, because the court's instruction concerning the identity of the shut-off mechanism was in error, we reverse the judgment in favor of Boyce and P & S and remand Turnage's claim against them for a new trial.

## A Wild Hose

Turnage was injured on November 27, 1986 while working as an electrician for Pool Company (Pool) on Pool's Rig 455. At the time of the accident, the rig was engaged in drilling activities for Shell on a Shell platform on the Outer Continental

Shelf of the Gulf of Mexico. Turnage was severely burned when a coolant-intake hose disengaged from an overheated engine used to power one of the rig's generators and spewed hot coolant and steam into the engine room where Turnage had gone to investigate a malfunctioning radiator.

Three electric generators powered the rig; each generator was driven by a Caterpillar diesel engine. The rig had four radiators to circulate coolant through the three engines. Each radiator was itself cooled by a belt-driven fan, one mounted behind each radiator. An electric motor, which drew its current from a GE Motor Control Center, drove the belt that propelled each fan. The Motor Control Center was equipped with four circuit breakers, one for each of the four electric motors; these circuit breakers protected against a short circuit. The Motor Control Center also featured four "overload heaters," designed to shut the motors down if heat built up due to a circuit overload.

### Discovery Brouhaha

■ Among the disputed theories advanced by Turnage which attempted to explain the cause of the accident, the parties agreed that the hose disengaged because the engine to which it was attached overheated. One explanation for the overheating of the engine, Turnage claims, is that the radiator fan stopped because the circuit breaker for the corresponding electric motor had tripped. From the inception of this suit, Turnage has maintained that the GE circuit breaker was internally defective. Prior to trial, he proceeded to notify all parties that on November 20, 1989, the circuit breaker would be opened, disassembled for investigation and discovery, and photographed. Presumably to avoid the charge of tampering with evidence, Turnage cautiously filed a Notice of Intention to Perform Test on November 14, 1989, and, in response, GE filed a motion for a protective order on November 17, 1989. Following a hearing, a magistrate judge

granted GE's motion because the pre-trial and trial dates were imminent and the deadline for the exchange of expert reports had passed.[1] Turnage moved for review of the magistrate's order by the district court; his motion was denied as violative of the court's scheduling order.

Turnage submits that the proposed inspection would have taken place within the proper period for discovery and would not have destroyed the circuit breaker. He adds that the passage of the date for exchanging expert reports was not a valid reason for denying the inspection. On the contrary, Turnage argues, the circuit breaker's condition was a critical issue, and its inspection would have "assisted the search for truth."

Regardless of how helpful this inspection may have been to Turnage's case, this court will reverse the district court's discovery ruling only if such ruling constitutes an abuse of discretion. *Mayo v. Tri–Bell Industries, Inc.*, 787 F.2d 1007, 1012 (5th Cir.1986). As this Court pointed out recently:

> Rule 16(b) of the Federal Rules of Civil Procedure authorizes the district court to control and expedite pretrial discovery through a scheduling order. Consistent with the authority vested in the trial court by rule 16, our court gives the trial court 'broad discretion to preserve the integrity and purpose of the pretrial order.' Moreover, a trial court's decision to exclude evidence as a means of enforcing a pretrial order 'must not be disturbed' absent a clear abuse of discretion.

*Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir.1990) (citations omitted).

Turnage had over two years to request his inspection of the circuit breaker but waited until a month before trial to file his Notice of Intention to Perform Test. Initially, in its rule 16 scheduling order of January 13, 1989, the district court ordered Turnage to exchange his experts' reports within 90 days, and the defendants to ex-

---

1. By minute entry of September 28, 1989, the district court scheduled trial for December 18, 1989, and set November 30, 1989 as the deadline for completing discovery. A final pre-trial conference was scheduled for December 13, 1989.

change their experts' reports within 60 days before the Pre–Trial Conference which was originally scheduled for May 2, 1989, later extended to May 25, 1989. The cut-off date had passed long before Turnage sought to examine the circuit breaker, therefore, the district court clearly felt that, given (i) the imminence of trial, (ii) the impending discovery deadline, and (iii) Turnage's failure to request an inspection earlier, Turnage's request to inspect the circuit breaker lacked merit. No matter how much we might believe that allowing the inspection might have been helpful—perhaps decisively so—or that such an allowance would not have adversely affected the imminent trial, we cannot find that the district court abused its discretion in denying the request.

### *Charge!*

■ Turnage claimed at trial that the circuit breaker or the shut-off mechanism connected to engine No. 1, or both, malfunctioned, thus causing the engine to overheat and the hose to disengage. The primary thrust of Turnage's case was that Boyce, approximately four months before the accident, remanufactured Engine No. 1 with a defective shut-off mechanism and that P & S failed to detect the shut-off's defect when it tested Engine No. 1 three

months prior to the accident. Turnage contended that the mechanism's specific defect was that it contained an "incorrect shaft." [2] Turnage, in fact, introduced two shut-off mechanisms at trial, exhibits 95 and 96, one of which had an incorrect shaft. The shut-offs were introduced as demonstrative devices to enable Turnage's witnesses to describe how the shut-off on engine No. 1 malfunctioned on the day of the accident.

■ Indeed, Turnage's witness Burlon Bateman, explaining that a normally functioning shut-off device protects the engine from overheating and from low oil pressure, was positive in his opinion that the particular shut-off within engine No. 1, which he had examined two to four days after the accident, was defective. Referring generally to the shut-off mechanism on Engine No. 1 and not to exhibits 95 and 96, Bateman testified that an "arm" to which both the pressure and temperature sensors report did not operate properly, thus causing the engine to overheat. That is, Bateman found that the shut-off device installed on engine No. 1 would not react to a high coolant temperature as it should have. The point of Bateman's testimony was that the shut-off mechanism actually on Engine No. 1 was defective, not that exhibit 95 or 96 was actually on the engine.

---

**2.** Specifically, Turnage claimed that Boyce improperly remanufactured the shut-off device by adjusting the device for marine application rather than for the industrial application that the rig required.

Paraphrasing Turnage's brief at pages 10–11, the operation of a shut-off device is described as follows: Emergency shut-off mechanisms for marine and industrial engines are almost identical. Industrial engines are equipped with a shut-off device that automatically "kills" the engine when the engine overspeeds or when the engine's oil pressure drops. An attachment that works in conjunction with the low oil pressure device, and "kills" the engine when the temperature of the engine's coolant is too high, is also available. This high coolant temperature attachment simulates a low oil pressure condition when the coolant reaches a set temperature while the engine is running in normal rotation. Therefore, by simulating a low oil pressure, the engine is "killed" when the coolant's temperature reaches a certain level.

A similar, yet different type of shut-off device provides marine engine-reversal protection, and is generally used in vessels. Engine-reversal

protection is needed to "kill" the engine on a vessel when the vessel's propellers are reversed, in which case the engine is automatically shut-off.

This type of shut-off device that provides engine-reversal protection in marine applications is similar to the type that provides low oil protection in industrial applications, except that the threads in the "worm" shaft inside the device are in opposite directions. In the marine application, if the engine's rotation is reversed, the oil pressure drops because the oil pump does not work when the engine rotates in reverse.

While both types of shut-offs, industrial and marine, will accept the high temperature attachment, the reversal protection (marine) shut-off device will not "kill" the engine when the coolant overheats. The high temperature attachment may inadvertently be installed on a marine-type shut-off device but is completely inoperative and worthless.

Turnage's theory, therefore, comes down to this: The shut-off mechanism's "incorrect shaft" or improper marine application setting prevented the mechanism from sensing the high coolant temperature and from "killing" the engine.

Turnage correctly points out that Bateman's testimony alone put before the jury the question whether engine No. 1 overheated due to a malfunctioning shut-off device. But the jury was not given that issue to decide. Rather, the question was turned into whether exhibit 95 or 96 was actually on Engine No. 1 on the day of the accident.

The court's instruction to the jury read as follows:

[I]f you find that *the shut-off mechanism introduced in this trial* was not on engine # 1 on the day of the accident, you must find that defendants Boyce Machinery and P & S Diesel are not responsible for plaintiff's injuries on the claim that the shut-off mechanism on engine # 1 was defective. (emphasis added).

Turnage correctly complains that the court's charge gave the impression that if the jury was not convinced that the shut-off mechanism introduced as an exhibit was actually removed from engine No. 1, then the jury should absolve Boyce and P & S from liability on the claim that the shut-off mechanism on engine No. 1 was faulty. In contrast to the charge as given to the jury, Turnage sought, and was denied, the following instruction:

If you find that *a shut-off mechanism with the wrong shaft* was not on engine # 1 on the Pool rig on the day of the accident, you must find that defendants Boyce Machinery and P & S Diesel are not responsible for plaintiff's injuries on the claim that the engine had the wrong shut-off. (emphasis added).

Whether Turnage objected in a timely way to the charge is not abundantly clear from the record. The trial judge, with commendable industry, had actually prepared by the first day of trial a full charge to be given to the jury which included the challenged instruction concerning the identity of the shut-off mechanism.[3] On the first day of trial, December 18, the court formally required that all objections to the

charge be made in writing and returned to the court on the following day, December 19, "before you come into the courtroom to do the day's work." (Vol. 7, p. 7). The judge explained that all such objections to the court's charge would be in the record. Apparently, Turnage's attorney was late in returning his objections to the court on December 19. The court refused to accept counsel's revisions, stating:

I've already redone my charge. I received nothing from you.... I told you that if you had anything submit it by 8:30 this morning and everyone else did. The plaintiff didn't which comes as no great surprise.... [I]t's been very difficult in this case because the plaintiff has not timely performed. And, again, the plaintiff hasn't timely performed.

(Vol. 8, p. 62).

Moments after this admonishment, but in response to defendants' objections concerning the chain of custody of the two shut-off exhibits, the court promised: "The jury will be charged on that issue [chain of custody] and it will be added to the charge as you've already received it and *you'll be given the opportunity to comment* with regard to it." (Vol. 8, p. 67) (emphasis added).

Later, on the final day of trial, December 21, plaintiff's counsel filed his objections to the court's charge concerning the identity of the shut-off mechanism introduced as an exhibit. (NR. 235 at Vol. 1, p. 7 of docket sheet; Vol. 6, p. 1706). That same day, prior to jury arguments, the district court held its jury charge conference.[4] In reference to Turnage's interlineated objections or requested changes to the charge, the court stated, "I am not going to make those." (Transcript of conference held in chambers on Thursday, December 21, 1989, p. 4). Subsequently that day, after the jury had retired, Turnage's counsel asked the court for permission to dictate his objections to the charge. The following exchange occurred:

---

**3.** See court's instruction to the jury, *supra.*

**4.** Our initial review of the record led us to believe there had been no charge conference. Further research, however, indicated that such a

conference was held, albeit in a poorly documented, piece-meal fashion. We, therefore, do not base our reversal on lack of a charge conference.

THE COURT: "[w]ell, you've already done that. The time's past for that. You were told to give them to me and—

COUNSEL: Oh, okay, if those are recorded, Judge.

THE COURT: Yes.

COUNSEL: If that's—okay.

(Vol. 10, p. 241).

■ Although counsel for Turnage was tardy in meeting the court's timetable for handing in written objections to the charge, he did get his objections into the record. Yet Turnage's most important objection, which was made in red ink interlineations on his copy of the court's typewritten charge, was less than precise. Despite its grammatical deficiencies, however, plaintiff's proposed instruction concerning the shut-off mechanism clearly indicated that Turnage thought the critical issue was not one of authenticity or identification, but one of the defectiveness or sufficiency of the shut-off device. Perhaps his proposed instruction could have been more clearly expressed, but it was clear enough. *See, e.g., Bueno v. City of Donna,* 714 F.2d 484, 490 (5th Cir.1983). Equally important, Turnage's objections to the charge were filed on the last day of the trial, and generally such a filing would be timely enough for Rule 51 which requires a party to object before the jury retires. *Doucet v. Gulf Oil Corp.,* 783 F.2d 518, 523 (5th Cir.1986). In this case, however, the judge, on the first day of trial, ordered all parties to file their written objections to the proposed jury charge by the beginning of the second day of trial. Later that second morning, well after the time to file objections to the charge had passed, Turnage's witness

Bateman testified that engine No. 1's shut-off malfunctioned, thus causing the accident. The court's charge, however, reflected that liability turned on the authenticity of the two shut-off exhibits introduced at trial. This was error. Liability did not turn on whether the particular shut-offs introduced as exhibits in evidence were the ones actually on Rig 455 on the day of the accident. Rather, liability for Turnage's harm turned on whether the shut-off protecting engine No. 1 malfunctioned on the day of the accident.[5] Furthermore, the court had promised that the parties would have another opportunity to comment on the court's proposed instruction concerning the authenticity of the shut-off mechanism. Either the district judge failed in his assurance that he would let the parties later comment on this instruction, or, having allowed them to comment and having considered their comments, he subsequently erred by rejecting the substance of Turnage's proposed instruction which presented the theory of the mechanically defective shut-off device, regardless of the identity or authenticity of exhibits 95 or 96.

■ Although the trial court is given great latitude in selecting the procedure it will follow on receiving objections to the court's jury charge, this case illustrates why the practice imposed here may result in a party being denied a valuable right to its great prejudice. Turnage's prejudice was especially great since the court required all parties to object to its proposed instruction concerning the authenticity of the exhibit before any testimony was received as to the function of the shut-off device, its operating defects or the identity of the demonstrative exhibits.[6] An inade-

---

5. That the shut-off devices introduced in evidence were intended as demonstrative aids, and not as proof of the authenticity of the shut-off mechanisms actually on the rig, is reflected by the following question asked of Burlon Bateman by Turnage's counsel: "Sir, I have here two shutdowns and I'm not going to ask you if these are the units that were removed. I'm going to ask you what they look like." (Vol. 8, p. 80).

Additionally, during the direct examination of Carl Sierra, Turnage's counsel, referring to one of the shut-off exhibits, asked: "If a shut-off *like* this ... were used on engine No. 1 ... would it

shut the engine down when it overheats?" (emphasis added) (Vol. 8, p. 194).

6. Under certain circumstances it might be proper for a trial judge to require a party's written objections to the charge to be submitted prior to crucial testimony which affects the objection. Such time-saving submissions may be proper as long as the trial judge offers that party another opportunity to object immediately after giving the charge and before the jury retires.

quate instruction merits reversal when "the charge as a whole leaves us with the substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189 (5th Cir. 1991) (quoting *Treadway v. Societe Anonyme Louis–Dreyfus*, 894 F.2d 161, 167–68 (5th Cir.1990) (citations omitted)). Indeed, the court's charge both concerned a non-issue and then failed to present the critical issue of whether the shut-off mechanism was defective. *See e.g., Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1075 (5th Cir.1986); *Corey v. Jones*, 650 F.2d 803, 807 (5th Cir.1981). Likewise, special interrogatory #3 of the jury's verdict form prevented the jury from even considering the decisive issue in interrogatory #6 since a "no" answer to #3 required the jury to proceed directly to interrogatory #8. That is, before the jury could determine whether the shut-off on Rig 455 actually malfunctioned on the day of the accident, the jury first had to find that the shut-off itself was physically in the courtroom as an exhibit.[7] Regardless of whether, as previously discussed, the objection to the charge was timely, we conclude that this determinative instruction constituted plain error since it did not even remotely present the issue of whether the shut-off was defective. This requires us to reverse the judgment in favor of Boyce and P & S and remand Turnage's claim against them for a new trial. *Jackson*, 788 F.2d at 1089–90; *Doucet*, 783 F.2d at 523.[8]

### Anything else?
### GE's liability

■ Turnage contends that the unanimous jury verdict finding the GE circuit breaker not defective nor the legal cause of his injuries was incorrect. He argues that the evidence presented at trial entitles him to a JNOV, or alternatively, a new trial. Weighing conflicting evidence and inferences and determining the relative credibility of witnesses to resolve factual disputes is the jury's province. Its decisions must be accepted if the record contains "competent and substantial evidence fairly tending to support the verdict ... even if different inferences and conclusions also might be supported by the evidence." *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 469 (5th Cir.1985) (quoting *Stewart v. Thigpen*, 730 F.2d 1002, 1007 (5th Cir.1984)); *Black Gold Marine, Inc. v. Jackson Marine Co.*, 759 F.2d 466, 470 (5th Cir.1985).

That the GE circuit breaker (which protected the circuit on which the electric fan motor for radiator #1 operated) did not prematurely trip is supported by the evidence, not the least of which is the plaintiff's own testimony that mere moments before his accident, as he passed radiator #1, he saw that the fan was turning. Furthermore, the only evidence offered by Turnage that the circuit breaker had tripped came from two of his co-workers whose credibility was severely impeached.

### Shell's liability

■ Finally, Turnage contends that the district court erred by granting summary judgment on his claim that Shell negligently failed to evacuate him soon enough from the rig to a medical facility for treatment of his burns. The trial court determined that Pool, Turnage's employer, was an independent contractor employed by Shell. The trial court concluded that the contract establishing this relationship did not place on Shell any duty to provide transportation to an independent contractor's employee, and Turnage failed to dem-

---

7. Special interrogatory #3 read as follows:
   3. Do you find from a preponderance of the evidence that the shut-off mechanism introduced as an exhibit in this case was on the #1 engine on Pool Rig #455 on November 27, 1989?
      Yes ___ No ___
   If you answered yes to question 3, please proceed to question 4.
   If you answered no to question 3, please proceed to question 8.

See jury's verdict form in Appendix 1.

8. Turnage also submits that the district court erred when it failed to instruct the jury concerning the liability of a remanufacturer. This point of appeal concerns Boyce only. Since the verdict in favor of Boyce is reversed on other grounds, we need not address this second attack on the court's charge.

onstrate that Shell's duty arose from some other source. Reviewing the summary judgment, we apply the same standard of review as did the district court. *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989). We agree with the district court that no genuine issue of material fact remains to indicate that Shell owed a duty to transport Turnage to a medical facility for treatment of his burns. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

*Wrapping it up*

We uphold the jury verdict in favor of GE and the court's granting of summary judgment in favor of Shell. We reverse the jury verdict in favor of Boyce and P & S and remand Turnage's claims against these two parties for a new trial.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR A NEW TRIAL.

**214**

# FILE IN RECORD

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DAVID TURNAGE | * | CIVIL ACTION |
| VERSUS | * | NO. 87-4449 |
| GENERAL ELECTRIC, ET AL | * | SECTION "G" |

## VERDICT FORM

1. Do you find from a preponderance of the evidence that the circuit breaker introduced as an exhibit in this case was on Pool Rig #455 on November 27, 1986?

Yes _____        No _____

If you answered yes to question 1, please proceed to question 2.
If you answered no to question 1, please proceed to question 3.

2. Do you find from a preponderance of the evidence that the circuit breaker was defective (i.e. unreasonably dangerous for normal use) at the time it left the control of the manufacturer, that it was in normal use or foreseeable misuse at the time of the accident, and that it was a legal cause of plaintiff's injury?

Yes _____        No ___X___

Please proceed to question 3.

3. Do you find from a preponderance of the evidence that the shut-off mechanism introduced as an exhibit in this case was on the #1 engine on Pool Rig #455 on November 27, 1989?

Yes ___KJC___        No ___X___

If you answered yes to question 3, please proceed to question 4.
If you answered no to question 3, please proceed to question 8.

4. Was it the same shut-off mechanism that was on the engine when sold by Boyce?

Yes ___✓___          No _____

If you answered yes to question 4, please proceed to question 5. If you answered no to question 4, please proceed to question 8.

5. Do you find from a preponderance of the evidence that Boyce Machinery is a manufacturer of the shut-off mechanism, or a seller of the shut-off mechanism?

Manufacturer _____          Seller ___✓___

If you find that Boyce Machinery is a manufacturer, please proceed to question 6. If you find that Boyce Machinery is a seller, please proceed to question 7.

6. Do you find from a preponderance of the evidence that the shut-off mechanism on engine #1 was defective (i.e. unreasonably dangerous for normal use) at the time it left the control of the manufacturer, that it was in normal use or foreseeable misuse at the time of the accident, and that it was a legal cause of plaintiff's injury?

Yes _____          No ___✓___

Please proceed to question 8.

7. Do you find from a preponderance of the evidence that the shut-off mechanism was defective (i.e. unreasonably dangerous for normal use) at the time it left Boyce's control, that the defect was obvious and apparent, that it was in normal use at the time of the accident, that it was a legal cause of plaintiff's injury?

Yes _____          No ___✓___

Please proceed to question 8.

8. Do you find from a preponderance of the evidence that P & S Diesel Service was negligent in the installation of the hose on engine #1 or in the checking of the shut-off mechanism on engine #1 on Pool Rig #455, and that such negligence was a legal cause of plaintiff's injuries?

Yes _____  No ___✕___

If you answered no to questions 1 or 2, and questions 3, 4, 6, or 7, **and** question 8, please sign this form and return to the courtroom. If you answered yes to questions 2, 6, 7, or 8, please proceed to question 9.

9. With respect to plaintiff's strict liability and negligence claims against General Electric, do you find from a preponderance of the evidence that a third person failed to take reasonable precautions for plaintiff's safety, and that the third person's conduct was the sole cause of plaintiff's injuries?

Yes _____  No _____

If you answered yes to question 9, please proceed to question 11. If you answered no to question 9, please proceed to question 10.

10. With respect to plaintiff's strict liability and negligence claims against General Electric, do you find from a preponderance of the evidence that comparative negligence is applicable as a defense?

Yes _____  No _____

Please proceed to question 11.

11. With respect to plaintiff's strict liability and negligence claims against Boyce Machinery, do you find from a preponderance of the evidence that a third person failed to take reasonable precautions for plaintiff's safety, and that the third

person's conduct was the sole cause of plaintiff's injuries?

Yes _____          No _____

If you answered yes to question 11, please proceed to question 13. If you answered no to question 11, please proceed to question 12.

12. With respect to plaintiff's strict liability and negligence claims against Boyce Machinery, do you find from a preponderance of the evidence that comparative negligence is applicable as a defense?

Yes _____          No _____

Please proceed to question 13.

13. With respect to plaintiff's negligence claims against P & S Diesel Service, do you find from a preponderance of the evidence that a third person failed to take reasonable precautions for plaintiff's safety, and that the third person's conduct was the sole cause of plaintiff's injuries?

Yes _____          No _____

If you answered yes to question 13, please proceed to question 15. If you answered no to question 13, please proceed to question 14.

14. With respect to plaintiff's negligence claim against P & S Diesel Service, do you find from a preponderance of the evidence that plaintiff was himself negligent, and that plaintiff's negligence was a legal cause of his injuries?

Yes _____          No _____

Please proceed to question 15.

15. Indicate what percentage of Mr. Turnage's injuries you find from a preponderance of the evidence to have been caused by

(a) the negligence of the plaintiff; (b) General Electric; (c) Boyce Machinery; and (d) P & S Diesel Service. You may assign a percentage of fault to the plaintiff only if you answered yes to questions 10, 12, or 14. You may assign a percentage of fault only to those defendants you have found responsible for plaintiff's injuries.

(a) The negligence of the plaintiff: _____

(b) General Electric: _____

(c) Boyce Machinery: _____

(d) P & S Diesel Service: _____

Please proceed to question 16.

16. Indicate in dollar amounts what damages, if any, the plaintiff is entitled to recover. Do not make any reduction in the amounts if you found that plaintiff was negligent. If any reduction is appropriate, the Court will make it.

Pain and suffering: . . . . . . . . . . $_____

Mental anguish: . . . . . . . . . . . . $_____

Past income loss: . . . . . . . . . . . $_____

Impairment of future earning capacity: $_____

Future medical expenses: . . . . . . . $_____

Please sign and date this form and return to the courtroom.

New Orleans, Louisiana, this _21_ day of December, 1989.

_____
FOREPERSON